CHICAGO PROFESSIONAL SPORTS LIMITED PARTNERSHIP and WGN Continental Broadcasting Company, Plaintiffs,

v.

NATIONAL BASKETBALL ASSOCIATION, Defendants.

No. 90 C 6247.

United States District Court, N.D. Illinois, E.D.

Jan. 24, 1991.

---

Joel G. Chefitz, Stephen D. Libowsky, James E. Hanlon, Jr., Andrew M. Hale, Katten, Muchin & Zavis, Chicago, Ill., for Chicago Professional Sports Ltd. Partnership.

John R. McCambridge, Irving C. Faber, Darrell J. Graham, Eric D. Brandfonbrener, Grippo & Elden, Chicago, Ill., for WGN Continental Broadcasting Co.

Tyrone C. Fahner, Matthew A. Rooney, Kenneth E. Wile, Herbert L. Zarov, Mayer, Brown & Platt, Chicago, Ill., Jeffrey A. Mishkin, Marc J. Goldstein, Proskauer, Rose, Goetz & Mendelsohn, New York City, Christopher Wolf, Warren L. Dennis, Proskauer, Rose, Goetz & Mendelsohn, Washington, D.C., for Nat. Basketball Ass'n.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND OPINION

WILL, District Judge.

The National Basketball Association ("NBA"), acting through its Board of Governors, limits the number of games NBA teams may broadcast over "superstations." Superstations are independent, over-the-air television stations that broadcast in their local market areas and are also carried by cable systems to other parts of the country. WTBS in Atlanta, WGN TV in Chicago and WWOR in New York are all examples of superstations. The NBA's rules, including those limiting games on superstations, of which there have been several over the years, are enacted by vote of the NBA's Board of Governors, a body consisting of one representative from each of the 27 NBA teams.

During each of the last five seasons, the NBA's superstation rules allowed every NBA team to broadcast up to 25 games on a superstation. But effective this season, the Board of Governors has adopted a new rule reducing that number from 25 to 20. Chicago Professional Sports Limited Partnership, owners of Chicago's NBA franchise, the Chicago Bulls, and WGN Continental Broadcasting Co. ("WGN"), to whom the partnership ("the Bulls") had licensed 25 Bulls games for this season, seek to enjoin the league from enforcing the new 20-game rule so that the Bulls may sell and WGN may buy rights to tele-

vise 25 rather than only 20 Bulls games for broadcast nationwide.

This is an antitrust case. The Bulls and WGN allege that the league's decision to reduce the number of superstation games permitted to any team constitutes a horizontal agreement among the NBA teams to restrict output and to boycott superstations, in violation of Section 1 of the Sherman Act. 15 U.S.C. § 1.

Having heard evidence and arguments over the course of five days and read the pleadings, the briefs, the relevant exhibits and designated deposition testimony submitted by the parties, we now enter our opinion, incorporating our findings of fact and conclusions of law as required by Fed. R.Civ.P. 52. The parties have submitted a joint stipulation of undisputed facts, which should be considered findings of the Court, though some of those facts may not expressly appear in this opinion.[1]

This opinion is divided into fifteen parts. Parts I through VII discuss the structure of the NBA, the history of the NBA's television policies as well its current policies, the logistics of superstations, WGN's contract with the Bulls and television coverage of Bulls games in Chicago and nationwide. Parts VIII through XIII summarize the contentions of the parties and address each of those contentions on the merits. Parts XIV and XV contain concluding remarks.

For the reasons set out in this opinion, judgment will be entered for plaintiffs, the Bulls and WGN. The NBA's five-game reduction in the number of superstation telecasts allowed to each team, from 25 to 20, is an unreasonable restraint of trade. A separate order recording the judgment and a permanent injunction, restraining the NBA from enforcing its present 20–game restriction on superstation broadcasts, will be entered.

## I

The NBA is a joint venture of its 27 professional basketball teams, based in cities and television markets as large as New York, Los Angeles and Chicago and as comparatively small as Charlotte, North Carolina and Salt Lake City, Utah. As joint venturers the teams have understandably entered into agreements about how many players are allowed on the basketball court, how high the basket should be, how many seconds should run on the shot clock and the like. Obviously, agreements on game rules are essential to producing basketball games at all. But the teams have also entered into league-wide agreements on a great many other subjects, including collective bargaining with the players, the college draft, group insurance, the licensing of products, and television contracts with the national networks. Those agreements are not strictly necessary to produce basketball games. The NBA is not simply a rule-making organization. It has an economic significance of its own and controls some competition between the teams off the court as well as on it.

In several areas, the league has virtually preempted economic activity by the individual teams. In marketing, for instance, the merger of the teams into the league is almost complete. It is undisputed that the league controls the trademarks and logos of all the teams and that, outside their own arenas, the teams have few if any rights to license the sale of merchandise—jackets or pennants or posters—with team or NBA logos. Through licensing agreements with the league's marketing arm, NBA Properties, Inc., each team has granted the league the sole and exclusive worldwide right, subject only to narrow exceptions, to license and use its "symbols." Several other facts are also undisputed: each team has granted all rights in the film footage of its games to NBA Properties, and no team may produce and sell a home video involving NBA basketball to the public, except as permitted by the NBA. Highlight videos of the Bulls superstar Michael Jordan, the

---

1. Several of the factual findings in the opinion are followed by source citations to the record. These citations have been abbreviated as follows: "Tr." marks a citation to the trial transcript; "PX," "DX," and "JX" refer to plaintiffs', defendant's and joint trial exhibits; "SF" is a citation to the parties' joint list of undisputed, stipulated facts; "Dep." refers to deposition testimony by a witness who did not appear live at trial.

Mikhail Baryshnikov of basketball, are, for example, licensed by the NBA not the Bulls. As a final example, in 1990, when Lee Auto Parts in Chicago wanted to run a sweepstakes promotion using Bulls tickets as prizes, the Bulls were required to submit their agreement with Lee to the league office for advance approval. SF 69, 70, 87, 103–105.

In substantial measure, the league acts as an integrated firm. Revenues generated from contracts for licensed products entered into by the league are split evenly among the teams, and the even split is redistributive. Not all teams contribute equally to sales. Last year, Bulls paraphernalia outsold every other team's products. SF 81. Notwithstanding, the Bulls receive the same 1/27th draw of the net as all the other teams.

The teams also pool and market some of their television rights jointly, through the league, under an exemption from the antitrust laws granted by Congress. See 15 U.S.C. §§ 1291–1295 (the "Sports Broadcasting Act"). For this season and the next three seasons, the NBA has sold broadcast rights, on behalf of all the teams, both to the National Broadcasting Company ("NBC") and Turner Network Television ("TNT"), a cable network. Revenues from those contracts will be shared jointly and the share to each team from the combined rights fees received from NBC and TNT this season will come to $6.8 million. SF 388; Tr. at 1079.

These fees from NBC and TNT represent the single largest source of shared revenues among the teams, and their agreement to pool certain TV rights, sell them jointly, and split the proceeds evenly reflects a kind of nonaggression pact among all the teams, an agreement not to compete in an area where they otherwise might. In a free open market, with each team doing its own bargaining, strong teams like the Bulls, the Detroit Pistons, the Los Angeles Lakers and the Boston Celtics would command more money this season than weaker teams like the Sacramento Kings or the Miami Heat. Under their agreement to pool TV broadcast rights, however, each team will receive the same amount. Whether the strongest teams could negotiate on their own for as much money as their pro rata share of what the league has obtained for them by pooling their rights is an open question.

The income of all the teams is significantly enhanced by the revenues from their joint projects. Combining the revenues from all their joint projects, broadcast and other, each team will receive nearly $8.5 million from the league this season as shared profits of their joint venture. For many teams the revenues from the shared ventures may mean the difference between operating in the black and net operating losses. The NBA Commissioner, David Stern, estimated that but for the $8.5 million they will receive from the league, 20 of the 27 teams would run net operating losses this season. Stern also testified that, even with the shared revenues, one or two teams might still finish the season in the red. Tr. at 917, 1076.

It is not disputed, and it is plain from the financial figures, that the prosperity of the league currently depends on the volume of the shared revenues generated by the league's economic activity on behalf of the teams and particularly on the revenues generated by the broadcast contracts with the national networks. As has been mentioned already, of the $8.5 million the league will distribute to each team this season, $6.8 million or 80% is attributable to revenues from national television contracts negotiated by the league.

Nevertheless, and despite the substantial economic collaboration among the teams, the NBA is only a partially integrated venture. The level of contractual integration among the teams lies somewhere in between what would be tolerated under the antitrust laws among wholly separate firms, on the one hand, and what one would expect from a fully merged or integrated firm on the other. Joint enterprises like NBA Properties, Inc. and the network contracts with NBC and TNT show the teams acting together as a single economic unit, pooling resources, agreeing not to compete with each other or the league and sharing

the risks and benefits of their joint endeavors. But the teams also remain very much separate entities, each one with economic significance in its own right.

Head-to-head direct competition in the marketplace is clearest in New York and Los Angeles. The New Jersey Nets compete against the New York Knicks and the Los Angeles Lakers compete against the Los Angeles Clippers in the same geographic market. All the teams compete for media attention, for coaching staffs and front office personnel and, with some restraints, for players.

The most significant sign of their economic independence is the fact that all the teams calculate their own profits and that what they earn on their own and keep for themselves is more substantial than what they produce together and share. In four of the last five years, from the 1985–86 season through 1989–90, the average NBA team collected slightly better than 50% of its total revenues from a single source, gate receipts for regular season home games. In the fifth season, 87–88, the proportion was 49.1%. JX 47. Only minuscule amounts of those revenues are shared. This season, each team will keep 94% of its regular season home gate, giving up only 6% to the league. SF 63. The teams earn more independently than they receive in shared revenues.

Although Commissioner Stern estimated that the $8.5 million that the league will distribute to each team this season may effectively double the gross revenues of the poorest teams, he also said that same amount would represent only 15–20% of the gross revenues of the richest teams. Tr. at 916. Last year, when the distribution from the league was much smaller, because television revenues from the league's national television contracts were less than half of what they will be this year, the proportion of its gross revenues which any team received from the league was also smaller. Shared revenues are not the primary source of income for many teams.

It is instructive, too, that fifteen to fifty percent income from revenue sharing is not the rule among professional sports leagues.

Some leagues show greater economic integration than the NBA does. Thus, revenue sharing among the teams in the National Football League ("NFL") runs much deeper than in the NBA. Of the total revenue of the 28 NFL clubs, roughly 70% flows from the league's network contracts and is shared equally. The NFL teams, unlike NBA teams, share their gate receipts 60–40 between the home team and the away team. The Commissioner of football, Paul Tagliabue, estimated that only 5–10% of an NFL team's revenues "is not shared in any way." Tagliabue dep. at 69–71.

All NBA teams depend on their own entrepreneurship and some teams do much better in the marketplace than others. The disparities among the teams' year-end financial statements are substantial. Last season, for instance, the Lakers recorded total revenues of $42.8 million dollars, which is more than three times as much as the Washington Bullets, who grossed a league low, $11.9 million. JX 47. For the 26 teams other than the Lakers, average revenues for the '89–90 season were $21 million—almost twice as much as the Bullets grossed but not even half of what the Lakers made. JX 47.

As a general trend, these disparities in revenues have an impact on competition on the court. Teams with impressive records tend to show bigger revenues than teams in the cellar. On the very most basic level, going to the playoffs means more games, and therefore more gate receipts, and more fan following and therefore higher rights fees from local broadcasting (which belong 100% to the teams)—in other words, more money. In 1989–90, the league champions, the Pistons, collected playoff revenues of $2.9 million dollars, net of the playoff revenues they shared with the league. JX 47. In addition, and to complete the circle, more money means a better chance at making the playoffs again. The richest teams enjoy competitive advantages on the court over the poorest teams—in the ability to bid for free agents or to pay to keep their own players who opt for free agency, and so field a strong team; in the ability to charter flights for away games, and so

field an alert team; in the ability to hire top notch staffs, and so field a well-coached team, and more.

The teams in the NBA cooperate in some ventures, but they engage in many others, on the court and off, as independent firms.

II

This season the NBA will gross more than $180 million from its network television contracts with NBC and TNT. NBC will carry 22 regular season games, TNT will carry 50 and each network will carry up to 30 playoff games. Time was, however, that the league's appeal to the networks was nowhere near what it is now. In 1981, CBS aired the NBA's premier event, its championship series, on tape delay rather than carrying it live and in prime time. League revenues from television, over-the-air and cable, were less than $23 million in 81–82, increasing to 27.5 million in 82–83, but in both cases amounting to less than 16% of the projected revenues for this season. JX 42; DX 368.

Today, the league is in full blooming financial health. Total league revenues this season are projected at $700 million. In 1982, they were $128 million. Tr. at 645. The economic resurgence of the NBA is nothing short of phenomenal, and as the league explains it, "[w]hile a number of factors have contributed to the resurgence of the League, one of the principal reasons for its current success has been a sound and consistent television policy." NBA's Proposed Findings of Fact ¶ 77, p. 52. NBA Commissioner David Stern has obviously done a superb job.

A significant strategic part of the league's television policy since 1982 has been to restrict the number of games in the market which compete with the league's national contracts. In particular, the league has taken several steps to limit local broadcasts and the independent rights of the teams to sell games, in order to maximize the value of the rights it sells to the national networks for national broadcast.

Beginning in 1979, the NBA's Board of Governors resolved that all future television contracts entered into by the teams would be made "subject to the Constitution, Bylaws and all other rules and regulations" of the league, "as they presently exist and as they may from time to time be amended," subject to "the terms of any existing or future" television contracts entered into by the league and subject to review by the Commissioner to guarantee compliance. At the same time, the Board of Governors also adopted a resolution reserving to the league "the exclusive right to enter into contracts for the direct telecasting of NBA games by cable systems located outside the territory of all members." That resolution effectively voided a national cable contract that had been signed by the New York Knicks. The league then entered into its own national cable contract, on behalf of all the teams, with the USA Cable Network ("USA"). USA promised to pay $1.5 million in fees over three seasons, 1979–80 through 1981–82. DX 368.

The next year, 1980, the Board of Governors adopted a further resolution, limiting each team to 41 over-the-air telecasts for the upcoming 1980–81 season. Every team plays 82 regular season games, and during the 1979–80 season at least one team, the Atlanta Hawks, had televised all 82 of its games on over-the-air television. At the same meeting, the teams also empowered the Commissioner "to take all steps deemed by him necessary to ensure compliance" with the television rules they had adopted, including the authority "to direct the forfeiture" of any game broadcast in violation of those rules, "to invoke and apply all sanctions and penalties available to him under the NBA Constitution," and to impose a fine of up to $100,000 for each violation or "for any refusal by any team to comply with any directive issued by the Commissioner in the implementation or enforcement of such" television rules.

The Bulls voted for both the 41–game rule and to grant the Commissioner the authority to enforce TV resolutions. Subsequently, they also voted for the renewal of those resolutions in every year through 1985, when, again with their approval, both resolutions became standing enactments.

The 41–game rule imposes a limit on superstations but also on all other over-the-air stations. No over-the-air station or network, except under a contract from the league, may carry more than 41 regular season games. The first limitation specifically tailored to superstations came in 1982, when the league signed new cable contracts with USA and with ESPN, for the 82–83 and 83–84 seasons, giving each network the rights to 40 games each season plus playoff games. The ESPN contract was for games on Sunday nights, while USA aired on Thursdays, and the Board of Governors quickly adopted a resolution barring the teams from televising games over superstations on either of those nights and thereby eliminated the possibility of head-to-head competition between games on superstations and the league's cable package.

In June 1985, the Board of Governors put further restraints on superstations, this time voting to limit the teams to 25 superstation games a year, beginning with the 85–86 season, down from the 41 that had been allowed in each of the previous four seasons. The Bulls voted for the resolution. In October 1989, the governors approved a permanent resolution "blacking out" superstation games on nights when an NBA game is shown nationally on cable as part of the league's national cable package, which, by this time, had moved from USA and ESPN to TNT. Most recently, in April 1990, the Board of Governors voted, over the objections of the Bulls and the New Jersey Nets to reduce superstation broadcasts by any team from 25 to 20, giving rise to this lawsuit.

The NBA's television strategy has not been mimicked by other professional sports leagues. The NBA, the NFL and Major League Baseball have each approached selling and regulating TV rights in different ways. All three leagues are currently in the first year of four-year contracts with the networks, running through their 1993 seasons, and each league read and played the market differently. Still, the networks agreed to substantial increases in rights fees for all of them.

The NFL negotiates all television rights deals for its teams and prohibits them from negotiating television contracts on their own, with the exception of contracts for certain pre-season games. The NFL's teams retain no rights and no games. SF 331. In addition, while the NBA has, since 1984, put its games on two national networks, one over-the-air and one cable, the NFL has opted to spread its coverage. This season, and through 1993, ABC is slotted to air NFL football on Monday nights. CBS will air NFC games on Sunday afternoons, while NBC airs the AFC. TNT will carry Sunday night games for the first half of the season, and ESPN picks up Sunday night for the last half of the season. All regular season NFL games are produced for network television; every NFL game is televised every week under one of the NFL's five network contracts. There are no superstation broadcasts of NFL games.

The NFL's new contracts are its most lucrative ever and the NFL was able to negotiate the increases despite the fact that ratings for NFL games, as a percentage of total households, have declined. Tagliabue at 75.

The NBA's broadcast strategy also differs from Major League Baseball's. Baseball recently signed a contract with ESPN for 175 games a season for four seasons, in its first move ever into national cable rights and exposure. At the same time, baseball has moved to limit its over-the-air exposure. Baseball's new 1990–93 deal with CBS gives the over-the-air network only 16 regular games this season, down from 40 games last year, leaving 24 new Saturday afternoon slots open to the teams. By contrast, since 1982 the NBA has steadily reduced the size of its national cable package from 80 games to 50 and upped its over-the-air package from 7 games to a possible 26, aiming for more exposure on the major over-the-air networks and less on national cable. DX 368.

Major league baseball regulates superstation broadcasts by imposing a surcharge rather than limiting the number of games directly.

## III

The NBA's television rules, as they are presently on the books, may be summarized as follows.

Under NBA rules each team may televise up to half (41) its regular season games, home or away, over any commercial over-the-air television station other than a superstation located in its "home territory." The teams keep 100% of the revenues from these local home territory, over-the-air broadcasts. A television station falls within a team's home territory if its "transmitters are located in the team's home state and/or in the area consisting of 150 miles from the corporate or unincorporated team city of operation," subject to some adjustments in cases where the home territories of two nearby teams overlap. SF 250. The teams are also allowed to sell over-the-air rights to a number of stations in isolated areas, remote stations outside NBA cities which have historically carried certain teams and which have been grandfathered in as exceptions to the rules.

There are very few, mostly negligible, limits on the number of games a team may televise over local cable in its "local market," meaning within a 75 mile radius of the corporate limits of the team's home city. The teams keep 100% of the revenues from these local market cablecasts.

Teams may also contract for cablecasts in an apron area up to 75 miles beyond the city–plus–75–mile–radius, but revenues from such "extended market" broadcasts are shared with the league. The league has also authorized contracts beyond the extended market, meaning contracts with regional cable systems, for which it charges a per subscriber fee.

Each team may, under the new rule, televise up to 20 games on a superstation. Superstation games count toward the tally of over-the-air games: a team that televised 20 superstation games would have 21 left to show on another local over-the-air station, not 41. Superstation games are the only nationally transmitted NBA games not controlled by the league. The teams currently keep the revenues from their contracts with the superstations. Supersta-

tion broadcasts, however, also generate royalty payments from cable operators who pay for the right to retransmit superstation games. The cable operators make these royalties payments to the Copyright Royalty Tribunal which then distributes them to copyright owners. The league receives these payments from the royalty tribunal on behalf of the teams and distributes them evenly among the teams. In 1990, the NBA received a distribution of $3,960,-345 from the Copyright Royalty Tribunal, largely though not entirely in compensation for NBA games televised on superstations, during the 1988 calendar year. SF 286.

The teams may not televise any game over-the-air, on cable, or on superstations opposite an NBC game and may not broadcast the same game carried by NBC at all, even on tape delay. The teams are not allowed to air a game on a superstation opposite a TNT game but may telecast even the same game TNT is carrying, head-to-head with TNT, on strictly local over-the-air TV or on local cable.

That exhausts the options open to the teams, individually. National network contracts, national cable contracts, and regional cable contracts are currently negotiated by the league. We turn now to those contracts.

## IV

Last season marked the final year of a four-year agreement between the NBA and CBS. That agreement produced revenues last year of $47.5 million, for 16 regular season games and 26 playoff games. Last season was also the final year of a league contract with TNT. TNT carried 51 regular season games and 30 playoff games last season, for which it paid $27 million. DX 368.

This year television revenues will be a whopping 241% higher. As the result of two new four-year deals, negotiated by the Commissioner, one with NBC and one with TNT, the league will receive $180 million this year, to be divided 27 ways among the teams. The new NBC and TNT contracts

are clearly coups for the Commissioner, the league and the teams.

Under the new contract, NBC will pay $601 million for exclusive over-the-air rights to up to 26 regular season games plus 30 playoff games, including the finals, over each of the next four seasons. The network must carry at least 17 regular season games each season. It has elected to carry 22 this season. NBC also agreed to provide $40 million of on-air commercials for NBA games over the next four years, 60% of which must be shown during prime time. NBC receives first pick of NBA games, before any other TV network or station, and receives exclusive rights to the games it selects. NBC games cannot be broadcast by another television network or station. NBC is not required to carry the Bulls or any other team, but may not show any one team more than seven times a season. The Bulls, the Lakers, and the Pistons will each appear seven times this season and the Celtics six.

There were effectively no price negotiations with NBC. Before signing with NBC, the NBA had offered its package to the incumbent rights holder, CBS, for $600 million plus promotionals. CBS refused and the league then went to NBC and offered the same contract on the same terms. But CBS, pursuant to an agreement with the NBA, retained a cleverly designed variation on a right of first refusal, which worked wonderfully for the NBA. Under the terms of that agreement, if NBC or any other network came forward with a bid in an amount less than the NBA's last demand to CBS, $600 million, then CBS got another turn to bid and was guaranteed the contract so long as it matched the new offer from the second network. This arrangement was made clear to NBC and, unwilling to bid even $1 less than $600 million and thereby take the risk that the contract would go to CBS, NBC bid $1 million more and landed the contract for itself. There was no dickering.

The NBA contract appears to be a success so far for NBC, which has already sold 80% of its NBA advertising inventory this season, at about twice the rates CBS was charging last year. DX 470. Still, and despite the strength of its advertising sales, NBC plans, as indicated, to carry only 22 regular season games this season, although it bought the rights to 26 and pays the NBA no less if it broadcasts only 22.

The NBA's second new four-year contract is a renewal with TNT, which, even though its ratings for NBA games last season were 20% lower over its universe than the ratings WTBS had scored the year before, agreed to a new four-year contract at $275 million for 50 regular season games plus 30 playoff games each year. DX 468; Tr. at 981. That is more than double, each year, what TNT had paid for the same number of games in its last contract. DX 368.

Both the NBC and the TNT contracts were signed before the league owners voted in April to reduce the number of superstation games from 25 to 20. The NBA discussed the issue of superstations with both networks but made no commitments to either network about reducing or eliminating superstation games. The Commissioner did, however, announce at a press conference following the signing of the contract with NBC that he intended to recommend to the Board of Governors that superstations be "phased out."

Major league baseball also negotiated its biggest contracts ever last year, despite the substantial number of superstation games that are televised, by the Cubs (145 games in 1991), the White Sox (45 games), the Atlanta Braves (120 games) and the New York Mets (75 games). NBA's Proposed Findings at 123, ¶ 291.

V

Under the technical definition used by the NBA, a "superstation" is "any commercial over-the-air television station whose broadcast signal is received outside of the local Designated Market Area ('DMA'), as defined by A.C. Nielsen Co., by more than 5% of the total number of cable subscribers in the United States as reported by A.C. Nielsen...." SF 308. Under the NBA's definition, there are three superstations in

the country right now, WGN, WTBS in Atlanta and WWOR in New York. All three carry NBA games. SF 309.

Superstations have existed for almost fifteen years and first appeared following passage of Section 101 of the Copyright Act of 1976, 17 U.S.C. § 111. Section 111 allows cable operators to retransmit copyrighted programming from any over-the-air stations across the country to their subscribers under a "compulsory license." The crux is the compulsory license. Because of it a cable company in California can legally transmit copyrighted programming broadcast over WGN without WGN's permission and without infringing the copyrights to the programming, so long as the cable company contributes a royalty fee to the Copyright Royalty Tribunal fixed by statute. See generally, *Hubbard Broadcasting, Inc. v. Southern Satellite Systems, Inc.*, 777 F.2d 393 (8th Cir.1985) (discussing section 111, the significance of the compulsory license and the rights of broadcasters and copyright owners); *Eastern Microwave, Inc. v. Doubleday Sports*, 691 F.2d 125 (2d Cir.1982) (same); 17 U.S.C. § 111 and 37 C.F.R. 308.2 (1990) (setting royalty rates); *Cablevision Systems Dev. Co. v. Motion Picture Ass'n of America, Inc.*, 836 F.2d 599 (D.C.Cir.1988) (discussing the royalty schedules).

The trick, following the enactment of section 111 in 1976, was to figure out how to get broadcast signals from the stations that were generating them to the cable operators and to encourage the birth of a secondary market of intermediate carriers capable of doing it. Ted Turner in Atlanta figured all this out early on, and in December 1976, he arranged for Southern Satellite Systems, Inc. to pick up the signal from WTBS in Atlanta, beam it up from Atlanta to a satellite transponder and then beam it back down from the satellite to cable operators across the country for retransmission. See *Hubbard Broadcasting, supra*, 777 F.2d 393. WTBS thus became the first major superstation.

WGN became a superstation in 1978, when United Video began plucking its over-the-air signal off the air and retransmitting it. Under the copyright laws, this did not require WGN's permission, and WGN received and receives no payments from United Video for the right to retransmit its signal, though WGN does receive royalty payments from United Video's customers, cable system operators, in the form of royalty payments for the retransmission of programming to which it owns the copyrights.

Since 1985, WGN has provided United Video with a direct microwave link-up, so that United Video currently transmits a signal which it receives from WGN over a microwave feed rather than plucking it from the air. In general, it transmits the microwave signal exclusively. Except during periods when there is a problem with reception over the microwave, United Video does not usually use WGN's over-the-air signal for retransmission. Initially, the primary idea behind the microwave feed, and its appeal to United Video, was to improve the quality of the signal that was retransmitted, though also to guarantee two signals, so that there would always be a backup if there were temporary problems with reception on one signal or the other. The microwave feed, however, also offers WGN and United Video other advantages, though WGN, in particular, does not fully exploit these.

The microwave provides WGN with two signals, which would enable the station to send out one signal over-the-air, locally in Chicago, and another over the microwave. By thus "splitting its feed," WGN could double its available inventory for advertisers and increase its revenues—by selling Chicago advertisers over-the-air time, selling national advertisers time on the microwave, and sending out both signals simultaneously but to different audiences, the over-the-air signal to Chicagoans, and the microwave signal to cable subscribers nationwide via United Video and the cable operators. Ted Turner does this all day long on WTBS. He sells two sets of 30-second spots for most programming—one, at local rates, for over-the-air broadcast to Atlanta viewers and one, at national rates, to cable viewers across the country, thereby taking advantage of WTBS' national

penetration and maximizing revenues. WGN, however, does not split its feed during most hours of the day and does not split it at all during Bulls broadcasts. It does split its feed for its telecasts of the Chicago Cubs and, for Cubs games, offers advertisers three choices—over-the-air Chicago only, national cable only or both.

Beginning in January 1990, the microwave feed became significant for a new reason. Effective January 1, 1990, the FCC re-enacted rules which give local broadcast stations the right to purchase exclusive rights to syndicated programming and forbid cable operators from importing the same programming into their broadcast markets. See 47 C.F.R. §§ 76.-151–76.163. See also *United Video, Inc. v. FCC*, 890 F.2d 1173 (D.C.Cir.1989) (upholding the FCC rules). These "Syndex" rules, as they are called, give a local broadcaster in Des Moines the right to buy exclusive rights, for example, to *Cheers* episodes in syndication and then prevent cable operators from sending *Cheers* in syndication into his local market area on WGN. The local broadcaster in Des Moines can force the cable company to "black out" *Cheers*.

The Syndex rules presented a problem for cable operators and intermediate carriers like United Video, and the microwave feed solved that problem. The question was how to substitute alternate programming on WGN's signal, when *Cheers* or some other Syndex blacked out show was running on WGN, so that WGN could still be carried, and carried black-out free, 24 hours a day in Des Moines. The microwave provided the answer. By agreement with United Video, WGN "covers over" *Cheers* and other syndicated, blacked-out programming on the microwave feed. In place of *Cheers*, WGN supplies substitute programming. In this way, the substitute programming rather than *Cheers* is sent over the microwave to United Video and then retransmitted in Des Moines and everywhere else WGN is received by satellite. (There is apparently no convenient way to cover over *Cheers* only in Des Moines but still send it everywhere else). WGN is paid by United Video for handling Syndex program substitutions and for oth-er services but not for United Video's carriage of WGN's signal.

Technically, WGN could cover over its Bulls broadcasts on the microwave to United Video the same way it covers over *Cheers*, so that its Bulls games would go out over-the-air only. At that point, Bulls games on WGN would be available to a national audience only if United Video abandoned the microwave feed and switched back to picking up WGN's signal directly off the air so as not to miss the Bulls. Whether United Video would do that is unclear.

## VI

From 1985–86 through 1988–89, Bulls games were occasionally shown in Chicago on CBS under the league's national contract but otherwise were carried in Chicago on two stations—the over-the-air Chicago affiliate for the Fox network, WFLD Channel 32, and also, for some of that period, on SportsChannel Chicago, a local cable company. The Bulls' multi-year deal with WFLD granted WFLD rights through the 1991–92 season and would have allowed WFLD to broadcast up to 41 games in Chicago this season. The Bulls and WFLD, however, terminated their contract in September 1989, and the Bulls moved the team to WGN Channel 9.

After terminating with WFLD but before signing with WGN, the Bulls also talked with a third independent over-the-air station in the Chicago area, WPWR Channel 50. WPWR offered the Bulls $3.8 million plus a percentage of net advertising revenues for the rights to 40 games for the 1989–90 season. DX 172, 377; Tr. at 546–547. The Bulls rejected that offer.

The contract the Bulls signed with WGN grants the station exclusive rights to 25 games for two years, 1989–90 and 1990–91, with an irrevocable option exercisable by either party to extend the agreement through 1993–94. WGN was interested in buying more games. Pursuant to the league's previous 25–game limit on superstations, however, the Bulls only offered 25.

The entirety of the Bulls–WGN contract was, as the league rules require, expressly made "subject to the terms of any existing or future" NBA television rules. The contract contains a walk-away provision. In the event that league rules, during the term of the contract, are amended to bar the Bulls from giving WGN at least 21 games, "due to [WGN's] status as a superstation," either party has the option of terminating the agreement, unilaterally. The contract also covers other contingencies. If, instead of limiting the number of games, the league levies a superstation fee, as Major League Baseball now does, the agreement provides for WGN to pay half of any assessment and also gives the Bulls a right to terminate.

Rights fees under the contract are calculated from "net advertising revenues." WGN promises to pay the Bulls 50% of "net advertising revenues" for the games, with a guaranteed minimum payment of $61,000 per game.

As a result of their move to WGN, the Bulls' gross revenues from local broadcasts doubled. In 1989–90, the first year of its contract with the Bulls, WGN aired 25 games for which it paid the Bulls $3.2 million or an average of $128,000 a game. The year before, 1988–89, WFLD had carried 37 Bulls games and paid the Bulls $1.6 million, or an average of $43,000 per game.

Ratings in the Chicago area have also soared. On WGN, Bulls broadcasts during 1989–90 scored, on average, a 10.2 rating in Chicago, which translates to 320,000 viewing households per game. By contrast, ratings on WFLD the year before had been in the 5's, corresponding to roughly 150,000 households, less than half the viewership pulled by WGN. The Bulls were a strong team both seasons. In 1988–89, the Bulls won 47 games and lost 35. In 1989–90, their record was 55 and 27. They sold out all their home games both years.

The improvement in the Bulls' ratings from WFLD to WGN is not readily explained by anything but differences between the two stations, differences which may include the strong, longstanding association between WGN and Chicago sports

in the minds of Chicagoans; the fact that WGN (Channel 9) is a VHF station while WFLD (Channel 32) is UHF, giving WGN a lower channel position, which stations covet; and the extensive promotion WGN gives Bulls games on the air during prime time.

WGN is currently the only over-the-air television station in Chicago licensed by any Chicago-area professional sports team. The station owns the exclusive over-the-air telecast rights to the Cubs, the White Sox and the Bulls. The Bears, Chicago's NFL franchise, are not allowed under NFL rules to market their rights independently, and the Black Hawks, Chicago's National Hockey League franchise, do not broadcast over-the-air.

## VII

WGN's ratings and stature in Chicago reflect only half of its impact in the market. Because its signal is transmitted by United Video to cable subscribers across the country, WGN is widely available outside Chicago. Programming on WGN reaches 34% of all television households nationwide, more than 30 million homes, and twenty-eight of those thirty-million-plus homes belong to cable subscribers outside of Chicago. Put differently, 31% percent of the nation's television households outside of Chicago both have cable and can watch Bulls games on WGN. These figures reflect "penetration," the number of potential viewers. The number of viewers outside Chicago who actually watch Bulls games on WGN, WGN's "delivery" in other words, is significantly lower. On average, during the 1989–90 season, 450,000 cable households outside Chicago tuned in to each Bulls game shown on WGN. SF 326. During the second half of the 89–90 season, after the reenactment of the FCC's Syndex rules, viewership was substantially lower. From January 1990 forward, average viewership outside of Chicago for a Bulls game on WGN was 336,000. PX 1004. Dennis FitzSimons, WGN's vice president and general manager, indicated that 50 percent of the viewing households outside Chicago,

for a Bulls game, are in cities that do not have NBA teams. Tr. at 146.

Adding the 336,000 viewing households outside Chicago that watch Bulls, post-syndex, to the 320,000 Chicago viewers who tuned in for each game, results in total viewership for any Bulls game on WGN of, on average, fewer than 700,000 households. For some games with particularly strong match ups the numbers are higher. CBS, by contrast, drew roughly 4.7 million viewers a game for its Sunday afternoon NBA broadcasts last season. TNT's delivery, at between 750,000 and 800,000 households for each of its NBA games, was comparable to, though still slightly larger, than WGN's. DX 503, 509; Tr. at 146.

There is no question that WGN profits from its national coverage of the Bulls. Its sales staff stresses the national coverage to advertisers, referring to it as the station's "bonus circulation advantage" or "rate advantage." Determining just how much WGN profits from carrying the Bulls nationally—in other words, what allocable share of the revenues WGN derives from Bulls broadcasts should be attributed to the premium it can charge because of its audience outside Chicago—is understandably difficult. Dennis FitzSimons estimated that being a superstation with a national audience enabled the station to gross perhaps 15% more than it otherwise could in revenues. Tr. at 281.

WGN is not the only superstation that will broadcast NBA games this season. WTBS, which penetrates more than 54 million households nationwide, is scheduled to carry 20 games for the Atlanta Hawks. WWOR, which reaches 13 million households, with about half of those outside of the local New York market, will carry 6 games for the Nets. WTBS and WWOR are not parties to this lawsuit. WWOR is unaffected by the 5–game reduction, given its plans to carry only 6 games. WTBS may have waived any right to sue. WTBS is owned by Turner Broadcasting System, Inc. ("TBS"), and TBS, by a letter agreement with the NBA, and in order to induce the NBA to enter its national contract with TNT, which is also owned by TBS (as are

the Hawks), agreed that it would support, comply with and not challenge any reduction by the NBA in the number of superstation games, up to 5 a season, provided that any such reduction would apply equally to all superstations.

## VIII

With or without the 20–game restriction on superstation games, all 82 of the Bulls regular season games are scheduled to be televised in Chicago this season in some way or another. NBC has selected 7 Bulls games, TNT has selected another 10, WGN is scheduled to show 20, and SportsChannel Chicago is set to carry 55, 10 of which are duplicates of games on TNT. The games on TNT and SportsChannel Chicago are available only to households that have cable television. Slightly less than half the households in Chicago are wired for cable.

## IX

We turn now to the contentions of the parties. The Bulls and WGN contend that the Board of Governors' resolution reducing the permissible number of superstation games from 25 to 20 constitutes both an unlawful horizontal agreement among the teams to restrict output and a group boycott of superstations, in violation of Section 1 of the Sherman Act. 15 U.S.C. § 1. The Bulls and WGN seek an injunction. 15 U.S.C. § 26.

The NBA's position is, first, that the 5–game reduction is protected from Sherman Act challenges by the antitrust exemption for professional sports leagues created by the Sports Broadcasting Act, 15 U.S.C. §§ 1291–1295; second, that the 5–game reduction has no significant, if any, restraining effect on trade; third, that even assuming the reduction represents a restraint on trade, it is not an unreasonable one; and fourth, that neither the Bulls nor WGN are proper plaintiffs.

The threshold issue in the case concerns the NBA's immunity, or lack of it, under the antitrust laws. The NBA has not argued that it is a single entity and therefore altogether immune from Section 1 attacks, instead limiting its argument to a conten-

tion that its superstation rules are exempt from Sherman Act attack by virtue of the Sports Broadcasting Act (the "SBA"), enacted in 1961.

■ The SBA provides, in section 1291, that the antitrust laws shall not apply to:

> any joint agreement ... by which any league of clubs participating in professional football, baseball, basketball, or hockey contests sells or otherwise transfers all or any part of the right of such league's member clubs in the sponsored telecasting of ... games....

15 U.S.C. § 1291. The parties agree that Bulls games on WGN qualify as "sponsored telecasting." WGN receives no money from cable subscriptions and relies on advertising sales for 98% of its revenues. But by its terms, the SBA only protects rights in sponsored telecasting that have been transferred or sold *by a league*. The exemption created by the statute does not cover this case.

The Bulls, not the NBA, both owned and licensed the rights to the five games that were transferred to WGN and which the 5–game reduction would eliminate. This was not a sale or transfer by "any league of clubs" but rather by the Bulls themselves, though subject to league approval, and the antitrust laws therefore apply. The SBA is not ambiguous on that point. It says transfers *by a league* and does not require deep interpretation. The NBA has propounded four lines of argument to show why the SBA does apply, but none of them defeat the clear wording of the statute. 1. The NBA's arguments that the rights sold to WGN were transferred by the league rather than the Bulls are unpersuasive. WGN bought a licence from the Bulls to televise 25 Bulls games, and the Bulls, as holder of the copyrights conveyed by that license, effected the transfer and retain the revenues from it, with the exception of the small amounts which the cable operators pay to the Copyright Royalty Tribunal and are shared by all the teams in the league. The NBA did not own the copyrights to the 25 Bulls games at issue here and could not transfer them.

The league had limited authority to block the transfer. The 27 teams in the league have agreed among themselves to refrain from contracting except on terms consistent with the NBA's bylaws and constitution and consented to have the Commissioner police their agreement. But nothing in that agreement nor anything else in the constitution or bylaws suggests any further agreement by the teams to share their separately owned copyrights and transfer those rights, in whole or part, to the league. The Bulls do not hold their copyright rights to the 25 games they licensed to WGN as *if in joint tenancy with the* league. Were the Bulls to leave the league or be expelled for contracting with WGN on terms contrary to the league's constitution or bylaws, the league would not be left with part ownership of the Bulls' copyright for the 25 WGN or any other Bulls' games but with nothing.

■ Arguably, the Bulls own the copyright to any given game jointly with the team they happen to be playing. But either of two joint owners of a work may grant a non-exclusive license to the work to a third party without permission of the other, subject only to a duty to render an accounting for a rateable share of the profits. 1 M. Nimmer, *Nimmer on Copyright*, §§ 6.10–6.12 (1990). No team has complained about the fact that the Bulls gave WGN exclusive over-the-air rights in the Chicago market or, directly, that the Bulls have not shared their profits. All NBA teams, save the Knicks, have similar over-the-air contracts in their local markets.

2. The Bulls, as well as all the other teams, have ceded some copyrights to the league—but not to all games or even for all national broadcasts. As a result of the league's contract with NBC, no team, neither the Bulls nor any other, has the right to license the telecasting of any of the 22 games NBC plans to carry this season. The teams have ceded their rights *in those games* to the league, and the league, as owner of the rights to those games, licensed them to NBC. The Bulls could not have sold WGN rights to their Christmas day 1990 match up with the Pistons, as that

game had been sold by the league and was carried by NBC. But neither the Bulls nor any other team has lost its copyright to games which have not been sold by the league.

Neither the constitution, the bylaws nor any other league document provides that the teams shall hand over to the league, outright, their copyrights to every game. Nor is there any document or contract providing that although ownership of the copyrights shall remain with the teams, only the league may license telecasts, whether national telecasts or any other kind. The silence is conspicuous. The teams *have* each signed licensing agreements granting the league exclusive rights to license their trademarks and other "symbols."

Section 1291 of the SBA exempts joint agreements among the teams to "transfer" rights, including the agreement to transfer 17 to 26 games to NBC during each of the next four seasons. But it does not, by its terms, similarly protect joint agreements "to prohibit the transfer" of national broadcast rights over and above those licensed to NBC (or possibly to TNT, assuming that TNT's broadcasts fit within the statutory meaning of "sponsored telecasting"). Games not sold by the league to NBC (or to TNT) remain the property of the teams.

3. The SBA is clearly worded. It says transfers by a league. Because the games sold to WGN were owned and transferred by the Bulls rather than the league, the SBA does not, by its terms, cover this case. Under some circumstances, however, that would not be dispositive.

By its terms, section 1 of the Sherman Act literally prohibits "every" contract, combination or conspiracy in restraint of trade. But ever since *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), Section 1 has been read as outlawing only "unreasonable" restraints. Reading Section 1 literally would be nonsensical. It cannot mean what it says or it would outlaw every contract.

The NBA argues, in essence, that reading the SBA literally would be nonsensical:

If the plaintiffs' challenge to the 20–Game Rule were to succeed, it would mean that although a league could "transfer" a package of "pooled rights," a league could not take the steps necessary to protect those rights and preserve their value. The key to the value of the NBA's pooled rights is exclusivity.... The Bulls' challenge to the 20–Game Rule would eviscerate the SBA by destroying a sports league's ability to transfer meaningful national-market broadcast rights. Thus, the 20–Game Rule must be protected under the SBA if the "transfer" the SBA specifically authorizes is to take place.

NBA's Pretrial Brief at 18–19.

The SBA, in the form enacted by Congress, may or may not be the best version possible, but it is not nonsensical, even read literally. The immediate impetus for passage was a 1961 court decision voiding a contract between the NFL and CBS as inconsistent with a consent decree that had been entered eight years before and was binding upon the NFL. See *United States v. National Football League*, 196 F.Supp. 445 (E.D.Pa.1961) (voiding the CBS–NFL contract); *United States v. National Football League*, 116 F.Supp. 319 (E.D.Pa.1953) (judgment against the NFL, resulting in a consent decree). By that 1961 contract, the NFL had awarded CBS the exclusive broadcast rights to all NFL games. The contract specified that CBS would televise every team's away games back into its home city, with the result that every single NFL game would be carried on television. The 1961 decision invalidated that contract. The immediate effect of the SBA was to establish that the CBS contract was lawful and to overrule the 1961 decision.

If the NBA were to transfer rights in all of its games and guarantee that all of them would be televised, which is what the NFL did in 1961 and continues to do today, the transfer would be protected by the SBA and immune from antitrust attack by the Bulls, WGN or anybody else. But the NBA has not transferred rights to all its games. The Bulls and the other teams still own and control the rights to the games

not included in the league's contracts with NBC and TNT, and therein lies the NBA's vulnerability to this lawsuit. To this, the NBA responds that the purpose of the SBA was not to compel all leagues to behave like the NFL, that if section 1291 only protects broadcast arrangements like the NFL's, and leagues with as much appeal to the networks as the NFL, then it provides next to no exemption at all. That result, the NBA urges, could not have been Congress' intent.

The words of the statute do not reveal much about Congress' intent, or lack of it, to protect leagues such as the NBA, which make package sales of fewer than all their games, from antitrust challenges. The statute does say that the SBA only protects transfers by a league, which the transfer to WGN clearly was not. Moreover, it says that unambiguously, making a search for deeper intent unnecessary. In addition, the result of reading 1291 to mean what it says is not so nonsensical as to compel changing its wording by judicial edict.

■ The statute does not protect agreements by a league to transfer "or prohibit the transfer" of rights. It only protects "transfers." The result of that wording is to shelter leagues such as the NFL, which sells 100% of its games to the networks, from antitrust attack but to leave the NBA, which sells less than 10% of its games to the networks, open to Sherman Act attacks to the extent that the NBA attempts to prevent its teams from transferring rights to the remaining 90% of its games, thereby making them available to viewers across the country. That result, whether intended or not, is not nonsensical, and arguments that the SBA should have been written more broadly should be addressed to the Congress not the federal courts.

4. The NBA makes one final argument about the SBA. Section 1291 allows a league to pool the totality of all its teams' television rights. Witness the NFL. Surely, says the NBA, if it allows that it must allow the NBA's less restrictive approach, which at least leaves the teams some rights. For it cannot be the case, says the

NBA, that the Sherman Act condemns a practice which allows for more competition than the lawful minimum. See *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). This argument frames the issue incorrectly. The question is not what the antitrust laws allow but what the SBA permits. The purpose of the SBA, as opposed to the purpose of the Sherman Act itself, was not to promote competition. It was to establish the legality of a practice which tends to restrain competition, package sales to the networks. Whether the SBA protects the NFL but does not protect the NBA, or possibly baseball or hockey, does not depend on how much competition for broadcasting those leagues permit but simply which practice or practices Congress meant to exempt. Antitrust exemptions are to be construed narrowly with minimal compromise to the antitrust laws. *Group Life & Health Insurance v. Royal Drug Co.,* 440 U.S. 205, 231, 99 S.Ct. 1067, 1083, 59 L.Ed.2d 261 (1979). The joint agreement by the teams to prohibit any one of them from transferring more than 20 games to a superstation is obviously not the same thing as a joint agreement effecting such a transfer. The antitrust laws therefore apply.

## X

■ Since the Sports Broadcasting Act does not bar WGN and the Bulls from attacking the legality of the NBA's decision to cut back on superstation games, the next question is whether they have standing to do so. Plaintiffs seeking an injunction under section 16 of the Clayton Act must establish both standing and "antitrust injury." *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986). The extent to which these two requirements overlap may be debated. The essential point is that both must be met and that together they require plaintiffs to prove the following: (1) that they have suffered or been threatened with loss or damage, in other words, an injury; (2) that the defendant's alleged violation of the antitrust laws was a proximate cause

of their injury; (3) that the injury, more than being simply "an injury causally linked" to an antitrust violation, is an injury "of the type the antitrust laws were designed to prevent"; and (4) that the injury "flows from that which makes [the defendant's] acts unlawful." *Id.*, 479 U.S. at 113, 107 S.Ct. at 491; *Brunswick Corp., supra,* 429 U.S. at 489, 97 S.Ct. at 697. "The injury or damage claimed must 'match' the violation and reflect the reason for finding a violation." P. Areeda and H. Hovenkamp, *Antitrust Law* ¶ 334.3a, p. 332 (Supp.1989).

■ The Bulls and WGN have each suffered or are threatened with injury. Five fewer games means losses in revenues for both of them. There are also nonmonetary injuries. For the Bulls, five fewer games on WGN means less exposure and fewer opportunities to build a strong and permanent following. For WGN it means lost opportunities to run high-profile, on-air promotions for the rest of its programming during Bulls telecasts which draw big audiences. In addition, both the Bulls and WGN stand to suffer injuries to their reputations and to the good will their telecasts generate among viewers. The NBA does not dispute this.

The NBA argues, however, that all these harms, threatened and actual, are self-inflicted rather than caused by the 5–game reduction, that the Bulls and WGN have injured themselves by "their own failure to take advantage of reasonable business options open to them." NBA's Rule 41 Motion to Dismiss at 5. The Bulls have, says the NBA, put themselves on the spot by selling rights to WGN in the first place, rather than to WPWR or WFLD, and by agreeing, moreover, to give WGN exclusive rights, a move which keeps them from going back into the market to sell not just the 5 games the rule takes away but as many as 21 more games to any other station in Chicago. Likewise, says the NBA, any injury threatened to WGN is its own fault, since WGN could broadcast as many as 41 games by covering over 21 on the microwave; could, in lieu of the 5 Bulls games, substitute other programming which would

reach the same audience and attract the same advertising dollars; and could have bid for the NBA's national contract.

Logically, the NBA's argument has holes. If I swing my fist at your face, you may decide to duck. But if you stand still, and I deck you, I am the cause of your injury. You did not punch yourself.

The NBA, by reducing by 5 the number of superstation games available to the Bulls and WGN, has caused injury in fact. That the Bulls and WGN might have side-stepped that injury does not change the chain of causation—or establish that the "fault" of the parties should be compared, if the 5–game reduction proves unlawful. Plaintiffs do not ordinarily have an obligation to change their behavior in order to escape injury from the unlawful acts of defendants; and this is not a case where assumption of risk, last one to the nuisance, nor even joint care should be the rule. The Bulls and WGN have signed a contract. The NBA has attempted to interfere with that contract. If the interference amounts to an unlawful restraint of trade, by the teams in concert, then it is no defense that no injury would have resulted if only the contract had never been signed or if the bargain had been struck on different terms.

The NBA also contends that there would be no injury to either WGN or the Bulls if only WGN would cover over its Bulls games, pointing out that WGN could actually broadcast up to 41 games by covering 21 on the microwave feed. That argument ignores that WGN reaps profits from broadcasting the Bulls nationwide, profits which it would lose by covering over Bulls games, and also that the Bulls profit from the national coverage since their contract with WGN is based on a profit sharing arrangement. Even if WGN could cover over its games, and prevent them from being retransmitted by United Video nationwide, both the Bulls and WGN would still suffer antitrust injury in the form of lost revenues.

In addition, the NBA's argument that the Bulls and WGN would not be injured if WGN simply covered over its Bulls broad-

casts has other problems. It assumes that WGN could prevent United Video from retransmitting portions of its signal. That is not clear. Specifically, the NBA assumes that Bulls games broadcast over-the-air but not sent over the microwave would not be picked up by United Video and retransmitted nationwide. Jeffrey Treeman, senior vice president of United Video, testified, however, that "if we [United Video] saw that there was programming coming to the microwave feed that was not on the air, I believe at this point I would ask our up-link to switch to the off-air [over-the-air] signal ... I think we would go to the over-the-air." Tr. at 410–412.

It seems unlikely that United Video would "go to the over-the-air" and abandon the microwave signal altogether just to get the Bulls games. Receiving WGN's signal over the microwave, rather than pulling it off the air, gives United a better quality signal and also enables it to offer cable operators a black-out free signal by having WGN handle the Syndex substitutions, which either United Video or the cable operators would otherwise have to handle themselves, at greater cost and not as well. United Video is no doubt less than anxious to give up the superior signal it receives over the microwave and return to the business of doing Syndex substitutions itself. But it might not have to. Short of using WGN's over-the-air signal 24 hours a day, just to get Bulls games, United Video might mix and match—picking up WGN off the air for Bulls games but then switching back to the microwave for the rest of the broadcast day.

The NBA argues that WGN could cover over Bulls games and United Video could not mix and match without jeopardizing its status as a common carrier. Treeman, however, testified that United Video believes that its status as a common carrier depends on its faithful delivery of WGN's over-the-air signal, with exceptions for commercials and programming protected by Syndex. Therefore, Treeman said, United Video presently considers that it could lawfully, and might in fact be required, to mix and match between what was going over-the-air on WGN and what it was re-

ceiving over the microwave, if there were ever a variance, except for commercials and Syndex, between the two—for instance, if WGN were to begin covering over its Bulls broadcasts on the microwave, in order to prevent them from going out nationwide. The issue has never been litigated. In any event, even if WGN could cover over its Bulls games and hoard them from United Video, the Bulls and WGN would, as mentioned already, still suffer antitrust injury, given the profits they earn from televising Bulls games nationwide.

The NBA has presented two more arguments connected to standing. The first is that the Bulls are not proper plaintiffs to complain about an output restriction. This is correct on one level. The Bulls stand to profit from the 5–game reduction to the extent that the NBA, by dictating to the teams how many games they may sell to superstations, manages to restrict overall output and raise prices. The antitrust injury if any which flows from higher prices belongs to the networks which must pay higher rights fees, advertisers to whom they pass on their costs, and fans who are stuck with fewer games. But it is not the case, as the NBA asserts, that the Bulls have simply brought this action as suppliers of injured customers, whom they have no standing to represent.

The complaint filed by the Bulls does not state, expressly, that the league's superstation rules restrain competition between the Bulls and the league or the Bulls and other teams. It should have. But the Bulls' briefs and their proposed conclusions of law, as well as the evidence and arguments presented at trial, leave no doubt that the Bulls were alleging injuries to their own opportunities as competitors. The Bulls have shown and alleged much more than business losses resulting from harm to WGN or to their fans, the losses of a supplier with injured customers. They have argued and shown what is obvious— that the 5–game reduction restrains competition among competitors selling rights in televised basketball by limiting the role of the individual teams in the national market and reserving that market to the league.

The Bulls, to put it simply, have argued that they would be better off if they were free to compete and that the NBA's attempts to keep them from competing have injured them directly. The 5–game reduction is a classic example of a joint venture attempting to eliminate competition between itself and its members.

■ The Bulls' membership in the league, moreover, in no way defeats their standing. They are not seeking simply a bigger share of league profits or compensation for losses that flow from injuries to their customers. They are seeking the right to compete independently of the league for profits of their own. The requirements of antitrust injury and standing have both been met. See, e.g., *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 139–40, 88 S.Ct. 1981, 1984–85, 20 L.Ed.2d 982 (1968); *Volvo North America Corp. v. Men's Int'l Professional Tennis Council*, 857 F.2d 55, 66–68 (2d Cir.1988); *Board of Regents v. NCAA*, 707 F.2d 1147, 1150–52 (10th Cir. 1983), *aff'd*, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984).

■ The NBA's last argument about standing is that WGN has no standing because it has waived all rights to sue. First, WGN knew of the likelihood that the 5–game reduction might be passed at the time it contracted with the Bulls. Second, paragraph 11.1 of their contract constitutes an express waiver: "The provisions of this Agreement are subject to the terms of any existing or future [television rules adopted by the league]. [WGN] acknowledges that it has no standing to object to any terms [of such rules] … or any changes therein." Third, WGN elected its remedies and waived all others by agreeing, in the contract, that either party may terminate the agreement if the league reduces the number of permissible superstation telecasts below 21.

The NBA's argument is not persuasive. Nothing in paragraph 11.1 or elsewhere constitutes a waiver of the right to raise antitrust claims against the NBA in court. At most, it constitutes a waiver of any right WGN might otherwise have had to

raise objections before the Board of Governors or control how the Bulls might vote on league resolutions. WGN certainly did not waive the right to pursue remedies for prospective violations of the antitrust laws in court. And if it had purported to, we would not hesitate to void such a waiver as contrary to public policy.

Both the Bulls and WGN have sufficiently alleged antitrust injuries flowing from the NBA's conduct, if it is unlawful. Both the Bulls and WGN are proper plaintiffs in this action.

## XI

■ The April 1990 resolution adopted by the NBA's Board of Governors, reducing by 5 the number of superstation games open to any team, restrains trade in obvious ways. Like all contracts it narrows the options of the contracting parties. It restrains "the freedom of traders." *Kiefer–Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211, 213, 71 S.Ct. 259, 260, 95 L.Ed. 219 (1951). Unlike most lawful contracts, it also represents a horizontal agreement among competitors to divide markets and control output, with the stated purpose of raising prices. Each team agrees to broadcast no more than 20 games into any other team's market and, with the exception of those twenty games, not to compete with the league for revenues in the national market. By allocating markets, the agreement reduces competition among the teams and between the teams and the league, as well as between superstations and other television stations and networks. By confining the teams to 20 games, the agreement places an artificial limit on supply and reduces it below the level which would prevail in a market where the teams and the league were competing in the national market and each team was free to match demand with supply.

The 5–game reduction restricts output in the national market. As a consequence of the planned reduction from 25 games to 20, which is the only restraint at issue in this case, there would be ten fewer games shown in the national market this season than there would otherwise have been, five

less on WGN and five less on WTBS. That is fewer games for superstations, for advertisers and for fans. It is an effect in the national market that is sufficient by itself to raise antitrust concerns.

The 5–game reduction also affects output in the Chicago market, at least to the extent that WGN cannot prevent United Video from picking up its over-the-air signal, in which case it could telecast up to 41 games. The new 20–game rule reduces WGN's present output by 5 games, or 20%. As the NBA points out, the 20–game rule does not prevent the Bulls from televising up to 21 more games on any other over-the-air station in Chicago, and in that sense, regulating the number of games shown on WGN may initially look like a control on out*lets* rather than out*put*, since output, as measured by the number of games, has not been directly limited.

Measuring output simply by the number of games gives an incomplete picture, however. Part of the reason teams license broadcasts to games is to generate rights fees but another is to buy exposure. There are at least two relevant "outputs" here, games and exposure, and the exposure on WGN is broader than on any other available station in Chicago. Ratings on WGN last season, in the Chicago area, were twice as high as they were for Bulls games two years ago on WFLD. For that reason, rights licensed to WGN are a different and a more desirable product from the Bulls' perspective than rights licensed to WFLD or any other available station in Chicago, and not just in terms of royalties, as evidenced by the fact that the team turned down WPWR's offer of $3.8 million for 40 games, which is more money than WGN ultimately guaranteed and more than the Bulls received from WGN last season. Games on other stations are not close substitutes for lost games on WGN, neither for the Bulls nor, if ratings are a fair measure, for advertisers or fans. Accordingly, a reduction in the number of games on WGN results in a reduction on output in the Chicago market, notwithstanding that all the 5–game reduction directly controls is where games are shown, not how many.

The 5–game reduction also represents a concerted refusal, on the part of the teams, to deal with superstations. The refusal is not absolute. Nothing about the reduction bars the superstations from bidding for the league's national package against the networks. The agreement among the teams to boycott superstations only covers individual dealings by individual teams and then only to the extent that any team would otherwise license more than 20 superstation broadcasts in a single season. Nonetheless, the five-game reduction is a form of a group boycott. The NBA argues that the collective decision by the teams not to air more than 20 games on any superstation was not designed to disadvantage competitors, that the boycott is targeted at superstations, that the league and the teams do not compete with superstations, and that therefore, the 5–game reduction should not be characterized as a boycott. Boycotts are boycotts, however, even when they target customers rather than competitors. "[T]he Sherman Act makes it an offense for [businessmen] to agree among themselves to stop selling to particular customers." *Kiefer–Stewart, supra,* 340 U.S. at 214, 71 S.Ct. at 261. The NBA's argument has been made before and has been rejected, by the Supreme Court. See *Saint Paul Fire & Marine Insurance Co. v. Barry,* 438 U.S. 531, 542–44, 98 S.Ct. 2923, 2930–31, 57 L.Ed.2d 932 (1978) and cases cited therein.

The 5–game reduction damages competition in several areas. It constrains competition between the teams and the league, by ousting teams from a portion of the national television market and allocating that portion to the league. It reduces competition between basketball on superstations and basketball on the networks, to the extent that they compete for viewers, and by the same token, also reduces competition between superstations and the networks for advertisers.

Further, by placing an artificial limit on the number of games in the market, the reduction makes supply less responsive to demand. Limiting the teams to 20 games keeps the teams from judging for themselves how many superstation games the

market might bear—and there clearly is demand as evidenced both by the audiences, outside Chicago and Atlanta, for superstation games and the interest among advertisers in buying time during those games. The number of games on television is less responsive to the preferences of broadcasters, advertisers and fans than it would be in a freer market.

The 5–game reduction also keeps viewers from deciding whether the games they want to watch will be on a superstation or on the networks. It "curtail[s] output and blunt[s] the ability of [the teams] to respond to consumer preference." *NCAA*, 468 U.S. at 120, 104 S.Ct. at 2970. It preempts market mechanisms by deciding for viewers, broadcasters and advertisers that they do not need games that they are currently demanding and, in doing so, "impairs the ability of the market to advance social welfare by ensuring the provision of desired goods." *FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 459, 106 S.Ct. 2009, 2018, 90 L.Ed.2d 445 (1986) (*"Indiana Dentists"*). In short, it interferes with the ordinary give and take of the marketplace. Output is lower than it would be in a competitive environment. Prices may be higher. If reducing supply does not push prices up, then the NBA's plan will have failed.

The NBA's 5–game reduction, imposed by the teams, results in a significant restraint on trade.

## XII

■■■■ The Bulls and WGN have suggested that *United States v. Topco Associates, Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972) and *United States v. Sealy, Inc.*, 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967) are good law and that consistent with those precedents the horizontal agreement between NBA teams to allocate the national market largely to the league should be condemned per · se. *Palmer v. BRG of Georgia, Inc.*, —— U.S. ——, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990) (per curiam) recently confirmed that per se condemnation of horizontal agreements is still sometimes appropriate, even after

*Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) (*"GTE Sylvania"*), *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979) (*"BMI"*), and *NCAA, supra*. But in the wake especially of *BMI* and *NCAA*, it is clear that *Topco* and *Sealy* no longer stand for the proposition that every horizontal elimination of competition is automatically illegal, in case they ever did. See generally, *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 224–29 (D.C.Cir.1986). Some horizontal restraints may still be branded illegal per se, as *Palmer, supra*, shows, but the NBA's 5–game reduction is not one of them.

■■■■ The Supreme Court has said that a concerted agreement among firms should be condemned, per se, when "the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output ... [rather than] increase economic efficiency and render the market more rather than less competitive." *BMI, supra*, 441 U.S. at 19–20, 99 S.Ct. at 1562–1563, repeated in *NCAA*, 468 U.S. at 100, 104 S.Ct. at 2961. In other words, a " 'naked restraint of trade with no purpose except stifling of competition,' " *BMI*, 441 U.S. at 20, 99 S.Ct. at 1562, quoting *White Motor Co. v. United States*, 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963), may be condemned after a quick look, without considering competitive justifications for it. For an example, see *Palmer*. But inquiry should not be cut off "where the economic impact ... [of the restraint] is not immediately obvious." *Indiana Dentists, supra*, 476 U.S. at 459, 106 S.Ct. at 2018. If the particular restraint under attack is arguably "ancillary" to a lawful purpose, see *United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 281–82 (6th Cir.1898), *aff'd as modified*, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899), and seems capable of enhancing competition rather than suppressing it, then the Rule of Reason applies. The restraint should not be condemned without examining its "redeeming virtues." This is

as true, moreover, for restraints with overtones of a group boycott as for others. See *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985).

A quick look here does not yield any absolute conclusions about the probable impact of the 5–game reduction. Arguably, controlling the number of NBA games available on superstations could enable the NBA to compete more effectively in the television marketplace against other programming, justifying the restraint. Cf. *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 726, 108 S.Ct. 1515, 1521, 99 L.Ed.2d 808 (1988) ("interbrand competition is the primary concern of the antitrust laws"); *Sylvania, supra*, 433 U.S. at 54–56, 97 S.Ct. at 2559–2560 (discussing the redeeming, procompetitive virtues of intrabrand restraints). See also *NCAA*, 468 U.S. at 115 n. 56, 104 S.Ct. at 2968 n. 56, citing *GTE Sylvania* ("If the NCAA faced 'interbrand' competition from available substitutes, then certain forms of collective action might be appropriate in order to enhance its ability to compete."). At a glance, it is not possible to say that the 5–game reduction, though it clearly restrains competition, is "a naked restraint of trade with no purpose except stifling of competition" and with no possibility for promoting it. Accordingly, the Rule of Reason applies.

The object of a Rule of Reason inquiry, as in any antitrust analysis, is "to form a judgment about the competitive significance of the [challenged] restraint." *National Society of Professional Engineers v. United States*, 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978) (*"Professional Engineers"*). That the 5–game reduction constitutes a restraint is readily apparent, which shifts the burden to the NBA to establish, as an "affirmative defense," *NCAA*, 468 U.S. at 113, 104 S.Ct. at 2966, that the reduction boasts some redeeming virtues—that it embraces objectives that are legitimate in principle, that it significantly advances those objectives, and that it is an at least reasonable means of advancing them. *Indiana Dentists*, 476

U.S. 447, 106 S.Ct. 2009; *Professional Engineers*, 435 U.S. 679, 98 S.Ct. 1355; *NCAA*, 468 U.S. 85, 104 S.Ct. 2948. Not all objectives or claimed benefits are legitimate in principle. The Rule of Reason does not open the door to just any manner of justification or to claims that the restraint broadly advances the public interest. On occasion, the Supreme Court has suggested that only competition counts, that "inquiry is confined to a consideration of impact on competitive conditions" and that a sufficient justification for a restraint must show that the restraint, which seems superficially to impede competition, really doesn't. See *Professional Engineers*, 435 U.S. at 690, 98 S.Ct. at 1364.

The NBA describes the redeeming virtues of its 5–game reduction as follows. The reduction "protects the teams' grant of exclusivity in their local markets," and "enhances the value" of the teams' "local television contracts by protecting the exclusivity of those contracts from dilution caused by the importation of games from other NBA cities by reason of superstation telecasts." It also "promotes" the teams' "media and sponsor relationships." It "protect[s] the value of the market extension agreements pursuant to which cable systems pay a fee shared equally by all NBA teams for the right to telecast local cable games in a team's extended market." It "enhances the ability of the NBA to grant exclusive and lucrative national broadcast contracts" and "protects the value" of those contracts. It "ensures the League is compensated for all national exposure of its games." It "preserves the price sponsors pay for national exposure on NBA national cablecasts and broadcasts." It "promotes the NBA's relationship with the national broadcast and cable networks." It "enhances the perception in the marketplace that the NBA offers a unique product and has control over that product." It "fosters the development by the NBA of new technologies." It "improves the level of competition in the television market and benefits consumers by making the NBA a stronger competitor and by providing greater national network coverage of NBA

games." And, "[i]n the long run, if the NBA as a league has no right to regulate the national distribution of NBA games by individual teams, the attractiveness of the league's national television product will be undermined, its national and local revenues will decline, the weaker teams will face financial difficulties, and the league's future will be threatened." NBA's Proposed Findings of Fact, ¶ 389(a-h), and Proposed Findings of Law, ¶¶ 102–106.

Most of the NBA's asserted justifications must be rejected on principle. The antitrust laws were enacted for "the protection of competition, not competitors." *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962). Maximizing revenues and "protecting the value" of individual team or NBA contracts are not legitimate justifications by themselves for restraining trade by limiting output. "We do it because it's more profitable" is not a defense under the Sherman Act.

The league's concern that superstations buy on the cheap the same product that the national networks pay millions of dollars for, and through sales which currently generate no shared revenues for the teams, with the exception of the small sums received from the Copyright Royalty Tribunal, is understandable. But the Copyright Act of 1976, whether wisely or foolishly, has created a regulatory environment in which superstations may lawfully do just that and would not be good capitalists if they did not. The effect may be to lessen the league's leverage with the networks, though on this record that is not clear. The NBA, however, may not restrain trade, without a showing that the restraint is reasonable, just in order to win back leverage that the copyright laws may have taken away.

The NBA's strongest defense under the Sherman Act is that the 5–game reduction, though it dampens competition in the television market for NBA basketball, actually promotes competition in another market—between the NBA's network packages and other network programming and between local NBA broadcasts by the teams and other local programming. The NBA, however, produced no evidence to confirm that effect.

The NBA produced no credible evidence, statistical or anecdotal, to suggest that superstation broadcasts of the Bulls, the Hawks or the Nets, on WGN, WTBS and WWOR, steal viewers away from any other team's local broadcasts or limit the number of games the team's have been able to sell in their local markets. The Commissioner opined, apparently by intuition, that superstations, by trespassing in local markets, hurt ratings for local NBA broadcasts. Tr. p. 1011. But no data showing any adverse effect on local ratings was ever introduced.

No representative from any of the teams or from any local station appeared to testify that superstation broadcasts have damaged carriage, ratings or revenues.

There is no support in the record for a finding that NBA broadcasts on WGN or any other superstation adversely effect the ability of any team to broadcast in its own local market, and there is no persuasive reason, in the absence of hard evidence, to believe that superstations have adverse effects on local broadcasts. Dennis FitzSimons' testimony suggests, for example, that half of WGN's audience for any given Bulls broadcast comes from areas that do not have NBA teams. In those areas, there are no local NBA broadcasts with ratings that might suffer. And even in cities that do have NBA teams, there is no reason to assume adverse effects that have not been shown. Given the loyalty of most fans to their own home teams, it is not obvious that a WGN broadcast of the Bulls would attract very many viewers in L.A. on a night when the Lakers were also on the air. Nor is it obvious that when there is no head-to-head competition, because WGN has the only game on television on one night, that the availability of a Bulls game would deter very many viewers from watching the Lakers, or any other home team, on local TV the next night or two nights later. Clearly, the probabilities will vary depending on the team the Bulls are playing and also the match up for the home team's game. Actual ratings data might

disprove the hunch that home team fans watch their home teams. But the NBA did not produce any ratings data on the effect, if any, superstations have in local markets.

The NBA also failed to produce evidence that superstations have any significant impact on the league's contracts with NBC or TNT. Both networks signed their present, big-dollar, four-year contracts with the NBA knowing that NBA games would also be carried on superstations and before the vote by the league owners to reduce the number of superstation games from 25 to 20. Although superstations were discussed during the NBA's negotiations with NBC and TNT, if either network had serious worries about competition from superstations, it did not act on them. Neither network asked for a contractual provision obligating the NBA to reduce the number of superstation games over the course of its four-year contract, and neither contract contains any such provision. Either network, if concerned about the number of superstation games, might have negotiated for a shorter contract in order to consider what effect, if any, superstation games had on its ratings or its ability to sell 30–second spots to advertisers.

There is, similarly, no empirical evidence in the record to show that games on superstations result in lower ratings for games on the networks. There was opinion testimony on the subject of ratings but not even much of that. No one from CBS appeared in order to so much as hazard a guess that ratings were off last year because of competition from the 74 NBA games that were on superstations. Nor did anyone from TNT testify that superstations were having an effect on ratings this year or last year. In fact, no one from CBS or TNT, the two networks with recent experience competing with superstations on NBA games, testified at all. There was, however, testimony from a representative of NBC.

Arthur Watson, a former president of NBC Sports and the NBC executive who negotiated NBC's contract with the NBA, testified in his deposition that superstations were "of importance" to NBC because "the more restrictive a product is to others, the more valuable it is to us now and in the future from an audience standpoint and from an advertising standpoint." Dep. at 29–30. That remark, offered without elaboration, demonstrates a concern about superstations. But it says very little, if anything, about the impact of superstations on ratings (or how many games NBC might buy if there were no superstations), and it is susceptible of at least two interpretations. Watson's remark might mean that he believes that without competition from superstations NBC's NBA ratings would be higher. But he did not say that explicitly, and he offered no data to support that belief. Alternatively, he might simply have meant to say, not necessarily that ratings would be higher, but only that NBC would be in a better position to sell advertising if it could tell advertisers, that along with TNT, it was only one of two outlets for reaching national NBA audiences of any size, rather than one of four or five, counting TNT, WGN, WTBS and WWOR.

It is clear, in any event, that NBC was not so worried by superstations, and the 56 games last season on WTBS, WGN and WWOR, as to lower the price it was willing to pay the NBA for its four-year contract. Nor did it consider superstations to be of enough importance to warrant including a provision in the contract with respect to them. The same is true of TNT.

The NBA has maintained throughout this litigation that superstations unquestionably have an effect on ratings and that the only question is how much. More than one NBA witness testified, again apparently on the basis of nothing more than intuition, that the more games there are in the market, the lower the ratings will be. As the Commissioner put it: "[T]o the extent that somebody has watched a national game [on a superstation] on Monday night and Tuesday night and Wednesday night and Thursday night and Friday night and Saturday night, that ... person is less likely to watch the Sunday afternoon match up" on NBC. Tr. at 1091. That is not even intuitive. It is almost sheer fantasy. NBA games vary in quality and appeal according to who's playing whom. Very few viewers,

even the most compulsive, are likely to watch basketball games without some regard to which teams are playing, and NBC and TNT usually televise the best match ups. For its 22 games this season, NBC is carrying the Pistons, the Lakers and the Bulls seven times each and the Celtics six. Even the most compulsive fans, the ones who watch basketball six nights a week, are likely to turn to NBC on Sundays to watch those games with those teams—particularly if they are that basketball compulsive.

Whether network ratings for NBA games would stay the same, go up, or even go down without competition from superstations would depend on a number of factors, including how hungry viewers are for NBA games, which games the networks are carrying and which games the superstations are carrying. And the NBA's failure to put in any, even crude, statistical evidence on the effects, if any, that superstations have on network ratings leaves a critical hole in its case.

There are at least two points that should be noted here and the first point is this: widgets may be fungible but not all NBA games are created equal. WGN only televises Bulls games and only those Bulls games that NBC and TNT have not selected for themselves. Likewise for WTBS' telecasts of the Hawks. Consequently, a viewer who wants to watch the best games, rather than just watch basketball, would tend to watch the games on NBC and TNT instead of a superstation, all other things being equal, and compulsive viewers will probably watch everything anyway. Thus, because NBC and TNT are carrying the very best games, or trying to, they are less likely to be losing viewers to the superstations than they otherwise might be, which may help explain, at least in part, why outside Chicago and Atlanta WGN and WTBS are generally drawing lower ratings across their universes for NBA telecasts than NBC and TNT.

The second point to note with respect to network ratings is that even wholly eliminating superstation telecasts of NBA basketball, rather than simply reducing the number of games by 10 (5 on WTBS this season and 5 on WGN) might not significantly increase NBC and TNT's ratings. The magnitude of any effect on ratings would depend on how saturated (or undersupplied) the market is right now and on how many rabid fans are already watching both the Sunday games on NBC (or TNT games) and superstation games. Neither NBC games nor TNT games ever go head-to-head with superstation games. If a sizeable number of the viewers who watch games on superstations are also watching the games on NBC and TNT, then reducing the number of superstation games would not tend to increase viewership for the networks.

The NBA, however, introduced no evidence whatsoever to show how many viewers are watching everything, or even most, of what's available right now. The only piece of evidence touching on that point, the testimony of an advertising consultant, Martin Wenzell, who conducted a "segmentation study" of NBA audiences for the NBA, indicated that by his estimate there are 16 million "hard core" NBA fans who, by definition, watch as many games as they can. Wenzell Dep. at pp. 38 and 74. Without some statistical proof that the superstations are costing NBC and TNT viewers, there is no persuasive reason to assume that they are, and the NBA offered no proof that they are.

The NBA also failed to prove that the networks would either buy the rights to more games or pay more for those rights but for the superstations. It is clear that an NBA game on NBC or TNT reaches far more viewers than a game on a superstation, and if there were evidence that the networks would contract for more games, reaching more viewers, if only they were freed from competition from WGN and WTBS, then restraints on the superstations might be justified. But no such evidence was presented.

The evidence that is in the record shows that NBC bought the rights to 26 games this season and the next three seasons, at a time when the league rules still allowed as many as 25 superstation games per team,

and that NBC only plans to televise 22 games this year, even though the league has now reduced the number of allowable superstation games to 20 per team. Similarly, TNT entered into its four-year contract at a time when the league rules still allowed 25 superstation games per team. The evidence also shows that in 1986 CBS signed a 4–year contract for 16 games a year—or 10 fewer than are provided for in the current NBC contract—at a time when there were only 24 superstations games to compete with, which is 22 *fewer* superstations games than there are now, even with the new 5–game per team reduction. On the record as it now stands, the most generous conclusion would be that it is simply impossible to tell whether the number of superstation games bears any relationship at all to the number of games the commercial or cable networks are willing to buy.

In the same vein, there is no evidence in the record that the networks would pay more for the games they buy if superstations were excluded from more, or even all, of the market for NBA games. In the last round of negotiations with the NBA, neither NBC nor TNT offered to pay a premium if superstation games were cut back. In the course of the NBC negotiations, in fact, there were no price discussions at all. The NBA put a figure on the table and NBC snapped it up. It may be doubtful, in any event, whether at current contract prices any of the networks could afford to pay an extra premium to eliminate or partially eliminate competition from superstations.

The example of Major League Baseball may be instructive. Roger Werner, a former president of ESPN and the ESPN executive who negotiated the network's recent contract with baseball, testified that during the baseball negotiations it was ESPN's view that "if [the volume of] superstation games and/or baseball games [on other networks] in general ... could be reduced, that the value of our package would be increased and that was clearly communicated." Dep. at 18. But "as things turned out," he said, "the price of the major league baseball package got so high that it became really a moot point as

to what kind of increased value might exist. We were really at a point in the ultimate bidding where there was no more money to spend ... [L]iterally we were tapped out." Dep. at pp. 20, 22.

The record plainly establishes that the NBA's 5–game reduction restrains trade and suppresses competition between the teams and the league and superstations and the national networks. The NBA has provided no evidence establishing that the reduction promotes competition, or will, between NBA basketball games or NBA games and other television programming of any kind.

### XIII

■ As a last defense, the NBA argues that WGN and the Bulls have failed to prove that the NBA has market power; that the 5–game reduction can have no significant anticompetitive effect in the market because the NBA does not in fact have any market power; and that under the Rule of Reason, a restraint not backed by market power is not unreasonable. The argument is a nonstarter, for two reasons.

First, the NBA has as much as conceded its own belief that it has market power. It argues now that it is simply a price taker, with no market power, that the prices of NCAA basketball, NFL football and other programming will severely constrain its ability to raise its own prices by a significant amount. But obviously it does not believe that. Its negotiations or lack thereof with NBC belie any such belief.

■ "Knowledge of intent may help the court to interpret facts and to predict consequences." *Chicago Board of Trade v. United States*, 246 U.S. 231, 239, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918). The NBA's stated purpose for reducing superstation telecasts is to get more money from the networks the next time around. Plainly, the league thinks that it has sufficient market power to make it worth its while to restrain competition, and it is seeking to restrain competition. Of course, its belief might be wrong. The league, however, which is plainly restraining competition be-

tween itself and the teams and superstations and the networks, has "little moral standing to demand proof of power or effect when the most [it] can say for [itself] is that [it] tried to harm the public but [was] mistaken in [its] ability to do so." 7 P. Areeda, *Antitrust Law* ¶ 1509, 411 (1986).

Second, the Supreme Court has plainly stated, that "[a]s a matter of law, the absence of proof of market power does not justify a naked restriction on price or output ... and requires some competitive justification even in the absence of a detailed market analysis." *NCAA*, 468 U.S. at 109–110, 104 S.Ct. at 2964–2965, repeated in *Indiana Dentists*, 476 U.S. at 460, 106 S.Ct. at 2019. "We have never," the Court said in *NCAA*, "required proof of market power in such a case." 468 U.S. at 110, 104 S.Ct. at 2965.

Concededly, the 5–game reduction is not a classic "naked restraint." It is not a restriction on output strictly for its own sake, condemnable per se. In other words, it is not entirely "naked" on a first examination. The NBA has dressed it up slightly, arguing that it is ancillary to a plausible and legitimate objective—improving the league's product and making it more competitive against competing products in the television market. But the restraints in *NCAA* and *Indiana Dentists*, were not classically naked in that sense either, as the Court conceded.

In *Indiana Dentists*, the dentists had dressed their concerted refusal to cooperate with the insurance companies behind a garb of improving patient care. But that did not keep the Court, having rejected the dentists' "patient care" defense, from treating their conspiracy as naked and condemning it, even without "specific findings ... concerning the definition of the market" or the dentists' "power ... in that market." *Indiana Dentists*, 476 U.S. at 460, 106 S.Ct. at 2019. See also *NCAA*, 468 U.S. 85, 104 S.Ct. 2948. (At least some "horizontal restraints on competition" were "essential" if the NCAA's "product [was] to be available at all," 468 U.S. at 101, 104 S.Ct. at 2960, but the NCAA's television

plan was not one of them. It was neither "necessary to market the product .. [nor] to enable the NCAA to penetrate the market through an attractive package sale," *id.* at 114–115, 104 S.Ct. at 2967–2968, and was therefore still "naked," *id.* at 110, 104 S.Ct. at 2965, and could be condemned without "a detailed market analysis," *id.*, or proof of market power.)

The NBA's 5–game reduction falls in the same category as the restraints in *Indiana Dentists* and *NCAA*. Its adverse anticompetitive effects have been established, and the justifications that have been offered in its defense are inadequate, at least on the present record. There is no evidence that it serves any legitimate objective. It stands, therefore, as a naked restraint, subject to condemnation even without proof of market power. See P. Areeda, *Rule of Reason—A Catechism on Competition*, 55 Antitrust Law Journal, 571, 577–78 (1986).

Defining a precise market and requiring proof of market power would, moreover, add nothing to the antitrust analysis in this case. "Since the purpose of the inquiry into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, 'proof of actual detrimental effects, such as the reduction of output,' can obviate the need for inquiry into market power, which is but a 'surrogate for detrimental effects.'" *Indiana Dentists*, 476 U.S. at 460–461, 106 S.Ct. at 2018–2019, quoting 7 P. Areeda, *Antitrust Law* ¶ 1511, 429 (1986).

The purpose of defining a market is to help estimate market shares, and the purpose of estimating market shares is to estimate the potential for adverse effects. But in this case, adverse effects are directly observable. Surrogates for those effects are not needed. The 5–game reduction demonstrably reduces the number of games available to viewers nationwide and the options open to advertisers for reaching those viewers, as well as the competition between teams and the league, and superstations and the networks in the national television market, and without evidence of any commensurate gains. Under the cir-

cumstances, market power is not a prerequisite to condemnation under the Rule of Reason.

"The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *Chicago Board of Trade, supra,* 246 U.S. at 238, 38 S.Ct. at 244. On the present evidence, the restraint imposed by the 5–game reduction suppresses competition without promoting it. It is therefore unlawful.

## XIV

It is apparent from the foregoing discussion that the Sports Broadcasting Act, enacted in 1961, and the 1976 amendments to the Copyright Act, which added Section 111 and the concept of a compulsory license, are products of an earlier day in television and particularly sports broadcasting. The SBA's distinction between sponsored or free TV and pay TV is meaningless today, since virtually all over-the-air and cable TV broadcasts carry advertising from commercial sponsors. And Section 111 predates microwave transmission of superstation signals to a cable common carrier such as United Video. Superstations now have the ability to cover over some of their transmissions and do so with respect to commercials and programs subject to Syndex. As a result, it is not clear whether, if the superstation "covers over" portions of its programming, for instance Bulls games, by replacing them with substitute programming on the microwave, the common carrier must seek to intercept and transmit the covered over programming from the superstation's over-the-air signal or whether it can transmit the substitute programming being sent by the superstation on the microwave, as it does for Syndex, and not lose its common carrier status.

Although we have no problem deciding this case on the basis of the statutes as they now stand, it has become apparent to us that some modernizing of the those statutes might well be desirable.

## XV

A final word. The NBA, we were informed, has commissioned a study, which will be completed this year, into the various aspects of its TV broadcast policy. That study or future contract negotiations may provide some reliable data, rather than intuition, as to the effect, if any, superstations have on competition and national distribution of NBA games. On the present record, it is clear that the NBA has made great strides and signed very favorable four-year contracts even with each superstation entitled to transmit 25 of its local team's games. The NBA's decision to reduce that number to 20, clearly a significant restraint of trade, has not been shown, on the evidence presented to us, to achieve or contribute to any legitimate objective by increasing availability of the NBA product to more consumers or increasing competition in the broadcast of NBA games or between NBA games and other forms of TV programming. On the contrary, the 5–game reduction will reduce availability and competition in the hope of raising the price of the product in the future. Such a restraint is unreasonable and therefore unlawful. It should be restrained. An appropriate judgment and injunction will be entered.