CHICAGO PROFESSIONAL SPORTS LIMITED PARTNERSHIP and WGN Continental Broadcasting Company, Plaintiffs–Appellees,

v.

NATIONAL BASKETBALL ASSOCIATION, Defendant–Appellant.

No. 91–1434.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 17, 1991.

Decided April 14, 1992.

Rehearing and Rehearing En Banc Denied June 4, 1992.

Joel G. Chefitz (argued), Stephen D. Libowsky, James E. Hanlon, Jr., Andrew Hale, Audrey G. Young, Katten, Muchin & Zavis, Chicago, Ill., for Chicago Professional Sports Limited Partnership, plaintiff-appellee.

John R. McCambridge (argued), Irving C. Faber, Darrell J. Graham, Eric D. Brandfonbrener, Grippo & Elden, Chicago, Ill., for WGN Continental Broadcasting Co., plaintiff-appellee.

David D. Hiller, Charles J. Sennet, Tribune Co.

Jeffrey A. Mishkin (argued), Marc J. Goldstein, Michael A. Cardozo, David M. Lederkramer, Bradley I. Ruskin, Proskauer, Rose, Goetz & Mendelsohn, New York City, Christopher Wolf, Warren L. Dennis, Proskauer, Rose, Goetz & Mendelsohn, Washington, D.C., Tyrone C. Fahner, Kenneth E. Wile, Matthew A. Rooney, Herbert L. Zarov, John E. Muench, Mayer, Brown & Platt, Chicago, Ill., for defendant-appellant.

James W. Quinn, Jeffrey L. Kessler, Bruce S. Meyer, Weil, Gotshal & Manges, New York City, for National Basketball Ass'n amicus curiae.

Stephen F. Ross, University of Illinois College of Law, Champaign, Ill., Gene Kimmelman, Consumer Federation of America, Washington, D.C., for Consumer Federation of America amicus curiae.

Before BAUER, Chief Judge, and CUDAHY and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

WGN–TV, channel 9 in Chicago, is called a superstation because cable systems throughout the nation carry its signal. During the 1990–91 season WGN telecast 25 games of the Chicago Bulls, one of 27 teams in the National Basketball Association. During the 1991–92 season WGN will telecast 30 of the Bulls' regular-season games. This is a boon to fans, for, apart from the seven contests broadcast on network TV, the remainder of the Bulls' 82 regular-season games appear on SportsChannel, which is available only on cable. It is a boon as well to the Bulls' owners, who collect larger royalties from WGN than from SportsChannel, in light of WGN's greater audience. But it is a bane to the other clubs, which would prefer to have fans watch their contests rather than tune in the Bulls, who, thanks to Michael Jordan and Scottie Pippen (to name only the Olympians), are the winningest and most popular team in the NBA.

Owners decided that only networks holding authority from the league may telecast nationally. The NBA sold to the National Broadcasting Company the right to broadcast 26 regular-season games; it sold 50 to Turner Network Television, a cable network. NBC gets first dibs. Clubs may telecast 41 games per season over the air to their home markets and put the other 41 on local cable, keeping the proceeds. No team may broadcast a game in competition with NBC, and superstations encounter two additional limits: they may carry no more than 20 games and may not telecast in competition with TNT. The cap, adopted in 1990 over the dissent of the Bulls and the New Jersey Nets, sparked this suit under the Sherman Act, 15 U.S.C. § 1. The Bulls and WGN characterize the NBA as a cartel that has slapped a limit on the output of broadcast games, something that is illegal under the antitrust laws. The NBA replies that it is a joint venture and that all broadcasting rules are lawful ancillary restraints. Both sides seek comfort in

*National Collegiate Athletic Association v. Board of Regents of the University of Oklahoma,* 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984). Seven weeks after the complaint was filed, the district judge held a five-day trial and promptly enjoined the NBA from enforcing the 20–game limit. 754 F.Supp. 1336 (N.D.Ill.1991). The district court's extensive opinion describes both the NBA's rules and the operation of superstations; we refrain from duplication. Challenges to some of the NBA's other broadcasting rules remain for decision in the district court. We confine our attention to the 20–game restriction.

I

Antitrust injury is one subject in particular that has not been presented for decision here. In the district court the NBA argued that the Bulls and WGN have not established that they suffer antitrust injury. The district court disagreed, 754 F.Supp. at 1352–55, and the NBA has dropped the point. Some of the district court's discussion suggests that the NBA confused antitrust injury with avoidable injury; the district court replied that the plaintiffs' ability to restructure their transactions to avoid some of the effects of the 20–game rule is neither here nor there for purposes of the antitrust injury doctrine.

Injury in fact establishes standing under Article III of the Constitution. Without question the Bulls and WGN suffer injury in fact. Antitrust injury is a different beast. The antitrust laws throttle some cooperative behavior of producers to preserve the benefits of competition for consumers. Producers often complain about the efforts of business rivals, which reduce their profits. E.g., *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.,* 881 F.2d 1396 (7th Cir.1989); *Indiana Grocery, Inc. v. Super Valu Stores, Inc.,* 864 F.2d 1409 (7th Cir.1989); *Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance, Inc.,* 784 F.2d 1325 (7th Cir.1986). Judicial relief from the real injuries caused by rivalry would harm the consumers the antitrust laws are supposed to protect. See William

J. Baumol & Janusz A. Ordover, *Use of Antitrust to Subvert Competition*, 28 J.L. & Econ. 247 (1985); Edward A. Snyder & Thomas E. Kauper, *Misuse of the Antitrust Laws: The Competitor Plaintiff*, 90 Mich.L.Rev. 551 (1991). The antitrust injury doctrine of *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990); *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986); and *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), requires every plaintiff to show that its loss comes from acts that reduce output or raise prices to consumers. *Isaksen v. Vermont Castings, Inc.*, 825 F.2d 1158 (7th Cir.1987); *Local Beauty Supply, Inc. v. Lamaur, Inc.*, 787 F.2d 1197 (7th Cir.1986).

Whenever producers invoke the antitrust laws and consumers are silent, this inquiry becomes especially pressing. The Bulls and WGN are producers. Their natural desire is higher prices and protection from competition. It may be that WGN in its role as purchaser of sports contests is a good proxy for the ultimate consumers—who are, depending on one's perspective, either the persons who watch the games on TV or the advertisers who "buy viewers" from TV stations as an input into promotion of other products. We assume that this subject will be explored further in the proceedings yet to come.

## II

As a basketball league, the NBA claims the protection of the Sports Broadcasting Act, 15 U.S.C. § 1291:

The antitrust laws . . . shall not apply to any joint agreement by or among persons engaging in or conducting the organized professional team sport[ ] of . . . basketball . . . by which any league of clubs . . . sells or otherwise transfers all or any part of the rights of such league's member clubs in the sponsored telecasting of the games . . . engaged in or conducted by such clubs.

In reply the district court observed that the statute speaks of "transfers" by "any league of clubs". What the NBA has done is *forbid* transfers, not make transfers; the league has regulated the activities of individual clubs, to which the Act does not apply. Accordingly the district court held that the statute does not exempt the NBA's rules from the antitrust laws. 754 F.Supp. at 1349–52.

No line between transfers made and transfers forbidden could be stable; they are two sides of the same thing. Property is a mixture of rights to use and to exclude others from using. Any transfer of broadcast rights entails exclusion of the competing uses of the same rights. Suppose the NBA sells to NBC the right to show all or any selection of its games, or carves the broadcast rights into thirds and parcels the rights among networks. See *United States Football League v. National Football League*, 842 F.2d 1335, 1353–55 (2d Cir.1988). Each grant to a network will be exclusive; what the network owns, a team cannot show separately (without the network's permission). Otherwise the league has little it can sell collectively. The Bulls acknowledge this by conceding that they may not sell to WGN a right to broadcast games that NBC has selected.

Unless the Act allows the league to bar broadcasting of at least some games, it is hard to see why it is cast as an exemption from the antitrust laws. Only a reduction in output allows producers to raise price. If the league arranges for the broadcast of every game (or if the clubs may broadcast every game the league does not), there is no reduction in output. To have any (antitrust) effect at all, the Act must allow the league to keep some games off the air. The statute allows the transfer of "all or any part of" the rights in the games; "part of" implies fewer than all. Even professional football, the sport with the most extensive broadcasting program, blacks out some home games. We therefore disagree with the district court to the extent it thought that the Sports Broadcasting Act applies only when the league arranges for (or permits) telecasting of every contest.

■ Still, the Sports Broadcasting Act applies only when the league has "transferred" a right to "sponsored telecasting". Neither the NBA's contract with NBC nor its contract with Turner Network Television transfers to the network a right to limit the broadcasting of other contests. Both contracts and, so far as we can tell, the league's articles and bylaws, reserve to the individual clubs the full copyright interest in all games that the league has not sold to the networks. As the "league of clubs" has not transferred to the networks either the right to show, or the right to black out, any additional games, the Sports Broadcasting Act does not protect its 20-game rule.

The NBA protests that such an approach is arbitrary. What if the league had assumed control of all broadcast rights and licensed only 20 of the Bulls' games to WGN? That would have been a "transfer" by a "league of clubs." What could be the point of forbidding a different mechanism (the rule limiting to 20 the number of games teams may sell to superstations) that leads to the same result? Other mechanisms to achieve similar outcomes abound. The league might have put a cap of 20 superstation games in its contracts with NBC and Turner, or it might have followed the path of professional baseball and allowed unlimited broadcasting over superstations while claiming a portion of the revenues for distribution among the clubs. (Sharing of revenues occurs in all team sports, although less so in the NBA than other leagues. See 754 F.Supp. at 1339–45.)

Whether there are ways to achieve the NBA's objective is not the question. Laws often treat similar things differently. One has only to think of tax law, where small differences in the form of a business reorganization have large consequences for taxation. Substance then follows form. *Howell v. United States*, 775 F.2d 887 (7th Cir.1985). Antitrust law is no exception: agreements among business rivals to fix prices are unlawful *per se*, although a merger of the same firms, even more effective in eliminating competition among them, might be approved with little ado.

Cf. *Palmer v. BRG of Georgia, Inc.*, —— U.S. ——, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990). Such distinctions are not invariably formal. The combined business entity might achieve efficiencies unavailable to the cartelists. But then the line in the Sports Broadcasting Act is not entirely formal either. Perhaps the reason the NBA has not commandeered all of the telecasting rights and sold limited numbers of games to superstations is that it cannot obtain the approval of the clubs to do this—for a change in the allocation of rights is apt to affect the allocation of revenues, making the bargaining problem difficult with 27 clubs. A league's difficulty in rearranging its affairs to obtain the protection of the Sports Broadcasting Act is one source of protection for competition.

■ What the NBA might have done, it did not do. The Sports Broadcasting Act is special interest legislation, a single-industry exception to a law designed for the protection of the public. When special interests claim that they have obtained favors from Congress, a court should ask to see the bill of sale. Special interest laws do not have "spirits," and it is inappropriate to extend them to achieve more of the objective the lobbyists wanted. *Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 646–47, 110 S.Ct. 2668, 2676, 110 L.Ed.2d 579 (1990); *Rodriguez v. United States*, 480 U.S. 522, 525–26, 107 S.Ct. 1391, 1393, 94 L.Ed.2d 533 (1987); *Board of Governors v. Dimension Financial Corp.*, 474 U.S. 361, 373–74, 106 S.Ct. 681, 688, 88 L.Ed.2d 691 (1986); *In re Erickson*, 815 F.2d 1090, 1094 (7th Cir.1987). What the industry obtained, the courts enforce; what it did not obtain from the legislature—even if similar to something within the exception—a court should not bestow. Compromises draw unprincipled lines between situations that strike an outside observer as all but identical. The limitation is part of the price of the victory achieved, a concession to opponents who might have been able to delay or block a bill even slightly more favorable to the proponents. Recognition that special interest legislation enshrines results rather than principles is

why courts read exceptions to the antitrust laws narrowly, with beady eyes and green eyeshades. E.g., *Group Life & Health Insurance Co. v. Royal Drug Co.*, 440 U.S. 205, 231, 99 S.Ct. 1067, 1083, 59 L.Ed.2d 261 (1979); *National Broiler Marketing Association v. United States*, 436 U.S. 816, 827–29, 98 S.Ct. 2122, 2129–30, 56 L.Ed.2d 728 (1978).

### III

The merits of the case turn on the characterization of the NBA. Is a sports league a single entity? In that event its decisions about telecasting are effectively unreviewable. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). True, its operating divisions (the teams) have separate owners, but on this view the league's method of hiring capital is no more relevant than would be the decision of a single firm to obtain loans from different banks in different cities, or the decision by a large retailer to compensate managers of its stores with a percentage of the local profits. Cf. *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210 (D.C.Cir.1986). Is the NBA instead a joint venture adopting strategies that foster its competition with other entertainments? In that event pro basketball on TV is not fundamentally different from *Star Trek: The Next Generation*, a series created by cooperation among many persons who are competitors at other times. Producers of a television series commit the episodes exclusively to one network (or one station in a local market) in order to compete against the offerings of other ventures. No program, indeed no producer's entire menu of programs, commands a substantial share of the market in televised entertainment. Marketing strategies such as exclusivity and limits on the number of episodes produced per year then must be understood as ways to compete rather than ways to exploit consumers. Perhaps, however, the NBA is a joint venture only in the production of games; in the hiring of inputs (from basketballs to players) and in the sale of their product, the owners are competitors. In that event the television rules look more

like a reduction in output, the work of a cartel, and only an exemption from the antitrust laws permits the owners to act cooperatively.

■ Characterization is a creative rather than exact endeavor. Appellate review is accordingly deferential. See *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 399–405, 110 S.Ct. 2447, 2457–61, 110 L.Ed.2d 359 (1990); *NCAA*, 468 U.S. at 104–20, 104 S.Ct. at 2961–70; *Mucha v. King*, 792 F.2d 602, 605–06 (7th Cir.1986); *Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1428–29 (7th Cir.1985). The district court held a trial, heard the evidence, and concluded that the best characterization of the NBA is the third we have mentioned: a joint venture in the production of games but more like a cartel in the sale of its output. Whether this is the best characterization of professional sports is a subject that has divided courts and scholars for some years, making it hard to characterize the district judge's choice as clear error.

Parts of the NBA's brief verge on the argument that a sports league is a single entity as a matter of law. Justice Rehnquist's opinion dissenting from the denial of certiorari in *National Football League v. North American Soccer League*, 459 U.S. 1074, 103 S.Ct. 499, 74 L.Ed.2d 639 (1982), supports such a position, to which *Copperweld* added weight two years later. There is a lively debate in the academic press on the subject. See Michael S. Jacobs, *Professional Sports Leagues, Antitrust, and the Single–Entity Theory: A Defense of the Status Quo*, 67 Ind.L.J. 25, 26–27 (1991) (collecting cases and commentaries pro and con). All agree that cooperation off the field is essential to produce intense rivalry on it—rivalry that is essential to the sport's attractiveness in a struggle with other sports, and other entertainments in general, for audience. The persons denominated owners of teams may not own them in an economic sense. Many of their actions are subject to review by the league's board, so that the "owners" may be no more than financier-managers of the league's branch offices. How much cooperation at the league level is beneficial is

an interesting question in economics as well as law. See Jesse W. Markham & Paul V. Teplitz, *Baseball Economics and Public Policy* (1981). But the NBA did not contend in the district court that the NBA is a single entity, let alone that it is a single entity as a matter of law. It does no more than allude to the possibility here. Whether a sports league is a single entity for antitrust purposes has significance far beyond this case, and it would be imprudent to decide the question after such cursory dialog. Perhaps the parties will join issue more fully in the proceedings still to come in the district court. For now we treat the NBA as a joint venture, just as the parties do in the bulk of their arguments.

■ If the NBA is a joint venture, then the Rule of Reason supplies the framework for antitrust analysis, as the district court properly held. 754 F.Supp. at 1357–58. *NCAA* leaves no room for debate. 468 U.S. at 98–104, 104 S.Ct. at 2958–61. Here the NBA concentrates its fire, for the district court condemned the 20–game limit without finding that the NBA has a significant share of a particular market. 754 F.Supp. at 1362–64. The league reminds us that "[t]he first step in any Rule of Reason case is an assessment of market power." *Polk Bros., Inc. v. Forest City Enterprises, Inc.*, 776 F.2d 185, 191 (7th Cir.1985). See also *Schachar v. American Academy of Ophthalmology, Inc.*, 870 F.2d 397, 398 (7th Cir.1989); *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 265 (7th Cir.1984); *Magnus Petroleum Co. v. Skelly Oil Co.*, 599 F.2d 196, 202, 204 & n. 26 (7th Cir.1979).

As the NBA points out, sports is a small fraction of all entertainment on TV, and basketball a small fraction of sports televising. Viewers of basketball games do not have qualities uniquely attractive to advertisers—and if they do, the advertisers can reach them via other sports programs and many other programs too. NBC advertises basketball games during sitcoms and other programs, implying that the market in viewers extends well beyond weekend sports programming. Higher prices, the hallmark of a reduction in output, are

missing: advertisers pay no more per thousand viewers of NBA basketball than they do for other sports audiences, and substantially less than they pay per thousand viewers of other entertainment. During 1990 the cost per thousand viewers (CPM) of a regular-season NBA network game was $8.17. NCAA football fetched $11.50, and viewers of prime-time programs were substantially more expensive. The CPM for *L.A. Law* was $19.34, the CPM for *Coach* $13.40. The NBA hardly has cornered the market on the viewers advertisers want to reach.

According to the NBA, this means that its rules do not injure viewers or advertisers, and it makes more sense to understand them as ways to compete against other suppliers of entertainment programming, all of which—right down to the smallest producers of syndicated programs—find it in their interest to sell exclusive rights to a small number of episodes. The NBA contends that until it tried to adopt a rational structure for television it had a much smaller audience than it does now. During 1980 and 1981 CBS carried the final game of the championship series by delayed broadcast! In 1982 only five NBA games appeared on network TV. A "restraint" that in the end expands output serves the interests of consumers and should be applauded rather than condemned. Rules keeping some popular games off superstations may help weaker teams attract the support of their local audiences, something that (like the sharing of revenues) in the longer run promotes exciting, competitive games. Teams in smaller markets depend more on live gate to finance operations that will compete with the Bulls, Lakers, and Knicks on the court. Rivalry makes for a more attractive product, which then attracts a larger audience—the very expansion of output that the antitrust laws foster.

A market defined by TV viewers is not the only way to look at things. The district court in *NCAA* defined a market of games shown. If "basketball games" are the product, then the NBA's plan cuts output by definition even if more persons watch the fewer (and more attractive) games

shown on TV. The NCAA tried to persuade the Supreme Court that the plaintiffs should be required to establish power in a viewership market. The Court replied: "We must reject this argument for two reasons, one legal, one factual. As a matter of law, the absence of proof of market power does not justify a naked restriction on price or output.... This naked restraint on price and output requires some competitive justification even in the absence of a detailed market analysis." 468 U.S. at 109–10, 104 S.Ct. at 2964–65 (footnotes omitted). Although this passage is not entirely clear, see Diane P. Wood, *Antitrust 1984: Five Decisions in Search of a Theory*, 1984 Sup.Ct.Rev. 69, 111–12, we understand it as holding that any agreement to reduce output measured by the number of televised games requires some justification—some explanation connecting the practice to consumers' benefits—before the court attempts an analysis of market power. Unless there are sound justifications, the court condemns the practice without ado, using the "quick look" version of the Rule of Reason advocated by Professor Areeda and by the Solicitor General's brief in *NCAA*. See 468 U.S. at 109–11 nn. 39, 42, 104 S.Ct. at 2964–65 nn. 39, 42; Phillip E. Areeda, 7 *Antitrust Law* ¶ 1508 (1986).

The district court proceeded in this fashion, examining the league's justifications; finding each wanting, the judge enjoined the 20–game rule without defining a market. In this court, the league's lead-off justification is that the telecasting rule prevents the clubs from "misappropriating" a "property" right that belongs to the NBA: the right to exploit its symbols and success. The district court properly rejected this argument on two grounds. First, it mischaracterizes the NBA's articles and bylaws, which leave with the teams the intellectual property in their games. The NBA could acquire a property interest in all broadcasting rights but has not done so. The 20–game rule does not transfer any broadcasting rights to the league; instead it shortens the list of stations to which clubs may sell rights the teams concededly possess. Second, it has nothing to do with antitrust law. We want to know the effects of the TV policy on consumers' welfare, not whether the league possesses sufficient contractual rights that it has become the "owner" of the copyright. See *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 52–53 & n. 21, 97 S.Ct. 2549, 2558–59 & n. 21, 53 L.Ed.2d 568 (1977) (rejecting an argument that legality of restraints under the antitrust laws depends on the characterization of a transaction in the law of property). A cartel could not insulate its agreement from the Sherman Act by giving certain producers contractual rights to sell to specified customers. Agreements limiting to whom, and how much, a firm may sell are the defining characteristics of cartels and may not be invoked as *justifications* of a cutback in output. That the NBA's cutback is only five games per year is irrelevant; long ago the Court rejected the invitation to inquire into the "reasonableness" of price and output decisions. E.g., *United States v. Trenton Potteries Co.*, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927); *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). Competition in markets, not judges, sets price and output. A court applying the Rule of Reason asks whether a practice produces net benefits for consumers; it is no answer to say that a loss is "reasonably small." (What is more, if five superstation games is tiny in relation to the volume of telecasting, the benefits from the limitation are correspondingly small.)

Only the NBA's contention that its TV policy controls free-riding deserves serious analysis. It costs money to make a product attractive against other contenders for consumers' favor. Firms that take advantage of costly efforts without paying for them, that reap where they have not sown, reduce the payoff that the firms making the investment receive. This makes investments in design and distribution of products less attractive, to the ultimate detriment of consumers. Control of free-riding is accordingly an accepted justification for cooperation. E.g., *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 108 S.Ct. 1515, 99

L.Ed.2d 808 (1988); *Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984); *GTE Sylvania; Illinois Corporate Travel, Inc. v. American Airlines, Inc.,* 889 F.2d 751 (7th Cir.1989).

Three forms of free-riding characterize the Bulls' telecasting, according to the NBA. First, the contracts with NBC and TNT require these networks to advertise NBA basketball on other shows; the Bulls and WGN receive the benefit of this promotion without paying the cost. Second, the NBA has revenue-sharing devices and a draft to prop up the weaker teams. The Bulls took advantage of these while they were weak (and through the draft obtained their current stars) but, according to the league, are siphoning viewers (and thus revenues) to their own telecasts, thus diminishing the pot available for distribution to today's weaker teams. Third, the Bulls and WGN are taking a free ride on the benefits of the cooperative efforts during the 1980s to build up professional basketball as a rival to baseball and football— efforts that bore fruit just as the Bulls produced a championship team, and which the Bulls would undermine.

Free-riding is the diversion of value from a business rival's efforts without payment. Consider the classic example of free-riding in retail distribution, introduced to antitrust analysis by Lester G. Telser, *Why Should Manufacturers Want Fair Trade?,* 3 J.L. & Econ. 86 (1960). Manufacturer produces a product or improvement that requires explanation or demonstration—perhaps a television set with an improved degaussing coil. Retailer #1 demonstrates the effects to consumers in a showroom filled with TV sets, some with and some without the feature. Such a demonstration is costly in merchandise, in staff time, in floor space. Neither Manufacturer nor Retailer #1 can charge the consumer for this information. Its value is too uncertain to expect the consumer to pay for access to the sales floor, and a retailer is not apt to gain customers by threatening to charge them if they leave without buying. So a consumer may leave the store with valuable information; Retailer #1 recovers the cost of supplying this information in the purchase price of the product, not with a separate charge. Yet a consumer armed with the information may order the product from Retailer #2, which offers no information. Retailer #2 can make a profit at a lower price than does Retailer #1, for Retailer #2 has lower costs. To compete, Retailer #1 must lower its own price, and that means lowering its costs too—cutting cost by cutting services that consumers value. Restrictions on the price, territory, or customers of Retailer #2 may restore the profitability of point-of-sale services, to consumers' benefit.

What gives this the name *free*-riding is the lack of charge. Retailer #1 does not charge the customer for a valuable service; Retailer #2 does not pay Retailer #1 for delivering this service. Put the retailers in a contractual relation, however, and they could adjust their accounts so that the person providing a valuable service gets paid. When payment is possible, free-riding is not a problem because the "ride" is not free. Here lies the flaw in the NBA's story. It may (and does) charge members for value delivered. As the NBA itself emphasizes, there are substantial revenue transfers, propping up the weaker clubs in order to promote vigorous competition on the court. Without skipping a beat the NBA may change these payments to charge for the Bulls' ride. If the $40 million of advertising time that NBC will provide during the four years of its current contract also promotes WGN's games, then the league may levy a charge for each game shown on a superstation, or require the club to surrender a portion of its revenues. Major league baseball does exactly this and otherwise allows its teams access to superstations. 754 F.Supp. at 1343. Avoidance of free-riding therefore does not justify the NBA's 20–game limit.

Doubtless there is irony in saying that the limit violates the antitrust laws *because* the defendants could adopt a system of charges for making sales. Revenue-pooling and pass-over payments are the usual tools of cartels. See *United States v. Addyston Pipe & Steel Co.,* 85 F. 271 (6th

Cir.1898) (Taft, J.), modified and affirmed, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899), describing the elaborate system of charges employed by a cartel during the final years such institutions operated openly. Charges for the privilege of putting games on superstations will lead to fewer such broadcasts; by selecting the tax carefully, the NBA could induce the Bulls to broadcast 20 games, neither more nor less, on WGN. Plaintiffs have hinted that they will ask the district court to ban all revenue-sharing procedures for telecasting. Yet we do not suppose that the Bulls are going to ask the court to hold that the draft of college players, the cap on their payroll, the distribution of revenues from the NBC and TNT contracts, and other sharing devices all violate the Sherman Act. Sharing is endemic in league sports. The prevalence of what is otherwise a hallmark of a cartel may suggest the shakiness of treating the clubs, which must cooperate to have any product to sell, as rival "producers" in the first place.

Because of the way in which issues have become separated in this litigation, we do not decide whether revenue-sharing from superstation broadcasts is consistent with the antitrust laws. Needless to say, we also do not decide whether any of the cooperative arrangements by which the league hires the services of the players comports with the Sherman Act. (The National Basketball Players Association, concerned that we might do some such thing by accident, has filed a brief urging us to guard our tongues.) It is enough to say that if the league may levy a tax on superstation broadcasts, then there is no free-riding. And if the league may not levy a tax, then a direct limit with the same effect as a tax is unjustifiable. Either way the NBA comes up short, and under *NCAA* the failure of its justifications eliminates the need for the district judge to define a market.

The NCAA argued that restrictions on the number of games telecast spread revenues and exposure among universities, helping to produce balanced competition on the field and hence making the games actually telecast more exciting, to the benefit of fans. Distributing telecasts among schools served, in the NCAA's view, as a substitute for the draft and other controls professional leagues deployed to the same end. The Supreme Court found the argument unpersuasive. It is hard to see how similar balance arguments by professional leagues, which make the most of drafts, trades, and revenue-pooling to foster exciting games, could be more compelling. Unless the Supreme Court is prepared to modify *NCAA*, the district court did not commit clear error in applying the "quick look" version of the Rule of Reason and rejecting the NBA's arguments.

## IV

We are conscious that this case went to decision like greased lightning. Seven weeks from complaint to trial is unheard of in antitrust litigation. Explanations of problematic conduct take time to develop and more time to test. A conclusion, which the district judge reached, that the NBA had not developed *and proved* a powerful proconsumer explanation for its rules is no surprise. Understanding novel practices may require years of study and debate. If litigation ought not resemble a marathon, neither is the 100–yard dash a good model. When the defendant bears the burden of explanation and demonstration, then ignorance leads straight to condemnation. Yet ignorance about effects is as consistent with benefits to consumers as with injury— and when the defendants lack market power, the effects are apt to be beneficial to consumers (neutral at worst), so ignorance ought not imply problems. As ignorance about the effects of business practices is regrettably plentiful, many beneficial practices are at risk.

Markets slowly but surely undermine practices that injure consumers. Competition does not undermine judicial decisions, so the costs of wrongly condemning a beneficial practice may exceed the costs of wrongly tolerating a harmful one. If the NBA had protested the haste with which this case was tried, we would have been inclined to question whether it was prudent to issue a final, rather than a preliminary, injunction so quickly. Yet although the

NBA's briefs in this court grumble about the breathless pace of the litigation, the league did not protest the schedule and did not ask the district court to issue a preliminary injunction and reserve final decision until it could collect additional evidence. Even now the NBA does not inform us that it has additional evidence bearing on this issue. It may be that developments during the impending trial on the NBA's other rules will cast new light on the 20–game rule. As things stand, however, the league has supplied no adequate reason for us to disturb the judgment.

AFFIRMED.

CUDAHY, Circuit Judge, concurring.

I agree fully with the result reached by the majority opinion and the imaginative and penetrating analysis on which it rests. I would, however, withhold judgment as to some of the more sweeping dicta on the singularity of focus of the antitrust laws on readily demonstrable consumer benefit. *See, e.g., Fishman v. Estate of Wirtz,* 807 F.2d 520, 535–38 (7th Cir.1986); *Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973). In addition, it may be that "[m]arkets slowly but surely undermine practices that injure consumers." *Ante* at 676. But theory may far outrun practice in assertions such as this.