**CHICAGO PROFESSIONAL SPORTS LIMITED PARTNERSHIP and WGN Continental Broadcasting Company,** Plaintiffs,

v.

**NATIONAL BASKETBALL ASSOCIATION,** Defendants.

**No. 90 C 6247.**

United States District Court, N.D. Illinois, E.D.

Nov. 6, 1992.

Joel G. Chefitz, James E. Hanlon, Jr., Stephen D. Libowsky, Andrew M. Hale, Laura R. Keidan, Katten, Muchin & Zavis,

Chicago, IL, for Chicago Professional Sports Ltd. Partnership.

David D. Hiller, Gen. Counsel, Charles J. Sennet, Associate Counsel, Tribune Co., John R. McCambridge, Irving C. Faber, Darrell J. Graham, Eric D. Brandfonbrener, Grippo & Elden, Chicago, IL, for WGN.

Tyrone C. Fahner, Matthew A. Rooney, Kenneth Wile, Herbert L. Zarov, Mayer, Brown & Platt, Chicago, IL, Jeffrey A. Mishkin, Marc J. Goldstein, Steven C. Krane, Michael A. Cardozo, Stephen D. Solomon, Proskauer, Rose, Goetz & Mendelsohn, New York City, for National Basketball Ass'n.

## MEMORANDUM OPINION

WILL, District Judge.

## I. FACTUAL BACKGROUND

For an extensive discussion of the factual background in this case, *see Chicago Pro. Sports v. National Basketball Ass'n*, 754 F.Supp. 1336, 1338–49 (N.D.Ill.1991), *aff'd*, 961 F.2d 667 (7th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 409, 121 L.Ed.2d 334 (1992).

## II. NBA MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant National Basketball Association (the "NBA") has moved this court for an order granting it partial summary judgment dismissing (1) plaintiff Chicago Professional Sports Limited Partnership's (the "Bulls'") antitrust challenge to the NBA Superstation Same Night Rule, pursuant to which superstation broadcasts of NBA games are not permitted on the same night as telecasts of NBA games over Turner Network Television ("TNT"); and (2) plaintiff WGN's claim for damages allegedly stemming from the NBA 25–Game Rule, which limits to 25 the number of games a team may broadcast over a superstation. The NBA also requests summary judgment on WGN's claim for damages arising out of

the Superstation Same Night Rule, in the event that this court denies its motion for summary judgment based on the Sports Broadcasting Act (the "SBA"), 15 U.S.C. §§ 1291–95 (1992).

The NBA advances two major arguments to support its motion for summary judgment. First, it argues that it is entitled to partial summary judgment since the Superstation Same Night Rule is exempt from antitrust scrutiny under the SBA due to the rule's inclusion in the NBA's contract with TNT, and because TNT constitutes "sponsored telecasting" within the meaning of the SBA. Second, the defendant argues that it is entitled to partial summary judgment dismissing WGN's claim for damages resulting from the 25–Game Rule since the Bulls never sought to license more than 25 games to WGN during the past two seasons and because the WGN–Bulls contract limitation of 25 games was based upon the Bulls' own economic and business considerations. Summary judgment is appropriate where the court is satisfied "that the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). For the reasons delineated below, the NBA's summary judgment motion is denied.

A. *NBA Motion for Partial Summary Judgment Under SBA Dismissing Bulls' Antitrust Challenge to the Superstation Same Night Rule Is Denied*

■ The NBA suggests that the Superstation Same Night Rule is exempt from antitrust scrutiny by virtue of the antitrust exception created by the SBA.[1] Specifically, the NBA claims that its Superstation Same Night Rule is exempt under the SBA

---

1. In relevant part, the SBA provides:
   The antitrust laws ... shall not apply to any joint agreement by or among persons engaging in or conducting the organized professional teams sport[] of ... basketball ... by which any league of clubs ... sells or other-

   wise transfers all or any part of the rights of such league's member clubs in the sponsored telecasting of the games ... engaged in or conducted by such clubs.
   15 U.S.C. § 1291 (1992).

from antitrust scrutiny by virtue of the rule's inclusion in the NBA's contract with TNT. According to the NBA, this position is supported (and perhaps even required) by the Seventh Circuit's construction of the SBA in *Chicago Pro. Sports Ltd. Partnership v. National Basketball Ass'n,* 961 F.2d 667 (7th Cir.1992). The NBA argues that the Seventh Circuit's review of this court's opinion broadly interprets the SBA to conclude that a professional sports league is entitled to prohibit the broadcast of games not otherwise transferred to a national television distributor so long as the contract by which the professional sports league transfers part of its national broadcast rights limits the broadcasting of other contests. *See id.* at 670 ("No line between transfers made and transfers forbidden could be stable.... We therefore disagree with the district court to the extent it thought the [SBA] applies only when the league arranges for (or permits) telecasting of every contest."). Because the NBA's contract with TNT expressly provides that NBA games may not be broadcast over a superstation when a TNT game is on the air, the NBA reasons that the Superstation Same Night Rule fits squarely within the Seventh Circuit's reasoning as to when a "transfer forbidden" is exempt from antitrust scrutiny under the SBA.[2]

No such conclusion necessarily flows from the Seventh Circuit opinion. Instead, the Seventh Circuit in extended dictum

merely hypothesized and declined to rule on various ways in which the NBA might "rearrange its affairs" in an attempt to qualify for the exemption.[3] The hypothetical musings of the Seventh Circuit with regard to how the SBA might apply to a different situation are not controlling in this case.

Moreover, in any event, the NBA has taken none of the steps posited by that court to try to obtain protection by "commandeer[ing] all of the telecasting rights" of the "27 clubs" and "rearranging its affairs" to change the clubs' "allocation of revenues." First, as we previously found, "nothing in any NBA agreement nor anything else in the constitution or by-laws suggests further agreement by the teams to share their separately owned copyrights and transfer those rights, in whole or in part, to the league." 754 F.Supp. at 1350, 1351 ("games not sold by the league to NBC (or to TNT) remain [the] property of the teams."). The Seventh Circuit agrees.[4] Second, the rights to the games licensed by the Bulls to WGN have not been transferred to the league or by the league to any other party. *See* 754 F.Supp. at 1350. As the Seventh Circuit affirmed, "the Sports Broadcasting Act applies only when the league has 'transferred' a right to 'sponsored telecasting.'" 961 F.2d at 671. The SBA, therefore, "does not, by its terms, similarly protect joint agreements 'to prohibit the transfer' of national broad-

**2.** The NBA's contract with TNT provides that "no NBA game may be distributed on a 'Superstation' ... during the regular season at the same time as the telecast of a [TNT] Game." NBA–TNT Contract, ¶ 11(A).

**3.** The Seventh Circuit posited the following hypothetical arrangements:
   What if the league had assumed control of all broadcast rights and licensed only 20 of the Bull's games to WGN? ... The league might have put a cap of 20 superstation games in its contracts with NBC and [TNT], or it might have followed the path of professional baseball and allowed unlimited broadcasting over superstations while claiming a portion of the revenues for distribution among the clubs. 961 F.2d at 671.
   However, after considering these hypothetical examples, the court stated:
   *Whether there are ways to achieve the NBA's objective is not the question....* Perhaps the

reason the NBA has not commandeered all of the telecasting rights and sold limited numbers of games to superstations is that it cannot obtain the approval of the clubs to do this—for a change in the allocation of rights is apt to affect the allocation of revenues, making the bargaining problem more difficult with 27 clubs. A league's difficulty in rearranging its affairs to obtain the protection of the Sports Broadcasting Act is one source of protection for competition.... *What the NBA might have done, it did not do....*
   *Id.* (emphasis added).

**4.** The Seventh Circuit stated:
   Both [NBC and TNT] contracts and, so far as we can tell, the league's articles and bylaws, reserve to the individual clubs the full copyright interest in all games that the league has not sold to the networks.
   961 F.2d at 671.

cast rights *over and above those licensed* to NBC (or possibly TNT, assuming TNT's broadcasts fit within the statutory meaning of 'sponsored broadcasting.')" 754 F.Supp. at 1350 (emphasis added). Third, because each team retains the right to televise on its particular local over-the-air or cable outlet the *same games* that are televised by TNT, the league's transfer of rights to TNT cannot be characterized as exclusive.[5]

Antitrust exceptions, in the words of the Seventh Circuit, must be read "narrowly, with beady eyes and green eyeshades." 961 F.2d at 672. Accordingly, for the reasons previously discussed, we conclude that the SBA does not exempt the NBA's Superstation Same Night Rule's prohibition of non-transferred superstation telecasts from antitrust scrutiny. There may be facts which preclude the Bulls and WGN from objecting to the Same Night Rule, but summary judgment as a matter of law is inappropriate.

■ The NBA's motion must be denied for a second reason: it is not clear that TNT constitutes "sponsored telecasting" within the SBA's meaning. Although the SBA does not expressly define the term "sponsored telecasting", the NBA argues that TNT telecasts are within the plain meaning of the term for several reasons. First, TNT is available to every television household whose cable provider wishes to carry the network.[6] Second, TNT telecasts of NBA games contain numerous commercial sponsor spots. Third, since viewers are not charged each time they tune in to TNT, the NBA contends TNT is indistinguishable from other indisputably sponsored commercial telecasting. Fourth, NBA argues that the SBA's legislative history reveals that its focus on "sponsored telecasting" was intended to exclude only closed circuit and subscription television and that TNT is neither closed circuit nor subscription television.[7] Finally, the NBA suggests that the recently enacted Cable Television Consumer Protection and Competition Act of 1992 (the "Cable Act"), Pub.L. No. 102–385, supports the characterization of TNT as "sponsored telecasting" within the meaning of the SBA.

In its status as a cable television programming service, however, it is not clear that TNT constitutes "sponsored telecasting" as that term is used in the SBA. Although it is indeed a hybrid programming service, TNT is perhaps better characterized as subscription television for the following reasons. First, no one receives TNT without paying for it. While it may be true that viewers do not pay each time TNT is selected on remote control, a viewer must pay to receive TNT through the costs of hook-up fees, monthly cable service fees and even additional monthly "premium ca-

5. Legislative history illuminates the narrow purpose of the SBA. The SBA was enacted to permit professional sports teams to pool television rights in certain or all of their games and then to sell packages of such pooled rights without violating the antitrust laws. *See* S.Rep. No. 1087, 87th Cong., 1st Sess. at 1 (1961), U.S.Code Cong. & Admin.News 1961, 3042 (The SBA was intended "to enable the member clubs ... to pool their separate rights in the sponsored broadcasting of their games and to permit the league to sell the resulting package of pooled rights to a purchaser, such as a television network, without violating the antitrust laws."); H.R.Rep. No. 1178, 87th Cong., 1st Sess. at 4 (1961) ("the sole effect of the [SBA] ... is to remove the league's package sales of the television rights of its members from the antitrust laws.").

6. The NBA contends that TNT is available to approximately 56 million of the nation's 92 million television households. Defendant's Memorandum In Support at 6–7.

7. During the congressional hearings concerning subscription television in the 1950s and 1960s, testimony suggested that subscription television involved the transmission of particular, individual television programs by means of a scrambled signal. *See* Subscription Television, Hearings Before the Subcommittee on Communications and Power of The Committee on Interstate and Foreign Commerce, House of Representatives, 85th Cong., 2d Sess. at 267–68 (1958).

The 1967 hearings characterized subscription television as a "pay television program," meaning "any television program to be received by members of the public only upon the payment by such members of a charge, fee, or other form of direct compensation." *See* Subscription Television, Hearings Before the Subcommittee on Communications and Power of The Committee on Interstate and Foreign Commerce, House of Representatives, 90th Cong., 1st Sess. at 2–3 (1967) (*quoting* H.R. 12435, 90th Cong., 1st Sess., para. (hh)).

ble" fees charged by some local cable operators for TNT and other expanded cable programming services. TNT is thus fundamentally different from indisputably "sponsored telecasting" such as the national broadcast networks and local over-the-air stations. Second, TNT derives its revenues predominantly from "subscriptions" as opposed to advertising revenues from paying "sponsors."[8] Third, prior and subsequent legislative history demonstrates that "sponsored telecasting" as used in the SBA is limited to free commercial television as opposed to cable.[9] In 1988, the Department of Justice opined, after acknowledging that some ambiguity exists with regard to the issue, that the SBA provided no antitrust immunity to the National Football League ("NFL") for its contract with ESPN, a cable operation similar to TNT.[10] Moreover, the then NFL Commissioner acknowledged during the 1961 hearings before the House Antitrust Subcommittee that the SBA "covers only the free telecasting of professional sports contests, and does not cover pay TV." Telecasting of Professional Sports Contests: Hearing Before the Antitrust Subcommittee of the House Committee on the Judiciary on H.R. 8757, 87th Cong. 1st Sess. 36 (1961).

■ Statutes must be construed according to the plain meaning of their terms at the time the legislation is passed. *United States v. Wise,* 370 U.S. 405, 411, 82 S.Ct. 1354, 1358, 8 L.Ed.2d 590 (1962). Additionally, as previously indicated, antitrust exemptions must be construed narrowly. "Sponsored telecasting" is not expressly defined by either the SBA or by any subsequent case law. In its report on the proposed legislation, the House Judiciary Committee noted only that "[t]he bill does not apply to closed circuit or subscription television." H.R. 9096, 87th Cong., 1st Sess. at 5 (1961). While the plain meaning of the term "subscription television" in 1961 might arguably have referred only to a pay-per-view service, it seems equally likely that the term "sponsored telecasting" would not have included such hybrid services as TNT and ESPN. "Sponsored telecasting" in 1961 referred to "free" television—the national network and local over-the-air broadcasting provided at no direct cost to viewers. The NBA's attempt to construe TNT as such "sponsored telecasting" simply because it contains commercial advertisements and is not offered on a pay-per-view basis is unconvincing. Since antitrust exemptions must be characterized narrowly, we conclude that TNT, like ESPN, falls outside the statutory meaning of "sponsored telecasting." The recently enacted Cable Act does not alter this conclusion.[11]

### B. NBA Motion for Partial Summary Judgment Dismissing WGN's Claim for Damages Is Denied

■ Plaintiff WGN claims that the 25–Game Rule prevented it from broadcasting more than 25 Bulls games during both the 1989–90 and 1990–91 NBA seasons. NBA contends that there is no genuine factual dispute that, independent of any alleged antitrust violation, 25 was the maximum

---

**8.** According to TNT's most recent Annual Report, "subscription" revenue for 1991 was $232 million and "advertising" revenue was only $138 million. Moreover, TNT's subscription revenue has exceeded advertising revenue in each of the first three years of its operation. Plaintiff's Memorandum In Opposition at 7.

**9.** *See* Telecasting of Professional Sport Contests: Hearing Before the Antitrust Committee of the House Committee on the Judiciary on H.R. 8757, 87th Cong. 1st Sess. at 4 (1961) (SBA is "designed to permit the sale of television rights by a league and its member clubs to a single network"); *id.* at 5 (SBA "applies to the sale or transfer of rights on the sponsored telecasting of games. The [SBA] does not apply to closed circuit or subscription television.").

**10.** *See* March 30, 1988 letter from the Antitrust Division of the Department of Justice to the Senate Judiciary Committee, at 4–5 ("While we believe there is some question as to whether programming such as ESPN's NFL games that is partly supported by advertisers and partly by viewers is 'sponsored telecasting,' our view is that it is not and thus does not come within the [SBA's] exemption.").

**11.** In fact, section 27 of the Cable Act states that "[n]othing in this Act or the amendments made by this Act shall be construed to alter or restrict the applicability of any Federal or State antitrust law."

number of games that the Bulls were prepared to license to WGN for these seasons and, thus, the 25–Game Rule is not the cause of any alleged damages suffered by WGN. Instead, the NBA suggests that the WGN–Bulls contractual limitation to 25 games was based solely upon the Bulls' own economic and business considerations.

WGN argues that in 1989, when the Bulls and WGN contracted for the televising of Bulls games for the 1989–90 and 1990–91 seasons, the Bulls were prevented by the NBA rules from offering WGN any more than 25 games per season.[12] Pursuant to the by-laws, each team's television contracts must comply with the terms of the NBA's own present or future television contracts and, in addition, are subject to the NBA Commissioner's approval. 754 F.Supp. at 1342. Had it not been for the 25–Game Rule, the Bulls presumably could have contracted for up to 41 games. WGN claims that the 25–Game Rule was the *only* reason that the Bulls did not offer more games for broadcast in the 1989–90 and 1990–91 seasons.

The evidence reveals that the Bulls in earlier years had contracted with WFLD for up to 40 games. The sworn testimony of the parties suggests that, but for the 25–Game Rule, the Bulls and WGN might have contracted for more than 25 games.[13] In response to the WGN and Bulls claims that they would have contracted for more than 25 games, the NBA correctly points out that the economic success of the Bulls on WGN during the last three seasons may not be probative of the Bulls' intent at the time that it executed the WGN agreement. Although it is not entirely clear the extent to which the Bulls and WGN may be benefitting from the advantage of hindsight in estimating the number of games which might have been contracted for absent the 25–Game Rule, WGN raises sufficient questions of material fact to require denial of the summary judgment motion on this issue.

■ The NBA also seeks summary judgment on WGN's claim for damages arising out of the Superstation Same Night Rule, in the event that this court denies the NBA's motion for summary judgment based on the SBA. WGN claims that it complied with the Superstation Same Night Rule only because the Bulls were required to do so by the rules and regulations of the NBA. According to WGN, the restriction precluded it from telecasting two distinct groups of games. First, WGN could not telecast any Bulls games that TNT decided to broadcast. Second, WGN was prevented from showing any Bulls games that were played on the same nights as TNT broadcasts of other NBA games, even when TNT was not showing a Bulls game. Whether or not the Bulls would have licensed WGN to televise Bulls' games on nights when TNT was carrying NBA games is, as yet, an unresolved question of fact. Accordingly, it is possible that WGN may have suffered injury resulting from the Superstation Same Night Rule. WGN has raised sufficient questions of material fact to preclude summary judgment on this issue as well. Accordingly, the NBA's motion is denied.

## III. CONCLUSION

For the aforementioned reasons, the NBA's motion for partial summary judgment is denied.

---

**12.** Article VIII of the NBA By–Laws requires that every television contract entered into by an NBA member club "be subject to the [NBA's] Constitution, By–Laws and all other rules and regulations of the [NBA] as they presently exist and as they may from time to time be amended." NBA By–Laws, § 8.01(ii).

**13.** The Bulls' Jerry Reinsdorf testified during the December 1990 trial that the Bulls might have licensed WGN more than 25 Bulls games in the absence of the NBA 25–Game Rule:

... I would televise as many games on WGN as I could consistent with ... our other obligations, either to the network or to cable channel.
Dec. 18, 1990 Trial Tr. at 463.
WGN's General Manager, Dennis FitzSimons, similarly testified at the December 1990 hearing that WGN would have broadcast more than 25 games had the NBA allowed the Bulls to license WGN to show additional games. *Id.* at 158; Dec. 17, 1990 Trial Tr. at 96.